438 F.2d 825
 Mildred DOLGOW, Benjamin Dolgow, Sarah Fischer and Reuben Isaacson, Plaintiffs-Appellants,
v.
Dillon ANDERSON et al., Defendants, and
Monsanto Company, Edward A. O'Neal, Edward J. Bock, John L. Gillis, Robert K. Mueller, Charles H. Sommer, H. Harold Bible, Patrick J. Dowd, John R. Eck, Arthur W. Lucas, Edwin J. Putzell, Jr., Robert R. Rumer, J. Russell Wilson, Earl J. Wipfler, Mercantile Trust Company National Association, in its Capacity as Executor of the Estate of Defendant Edgar M. Queeny, Deceased, and Edwin J. Putzell, Jr., in his Capacity as Executor of the Estate of Defendant John L. Christian, Deceased, Defendant-Appellees.
 No. 711.
 Docket 33719.
 United States Court of Appeals, Second Circuit.
 Argued April 23, 1970.
 Decided September 2, 1970.
 As Modified October 29, 1970.
 On Rehearing January 18, 1971.
 
 Avrom S. Fischer, Brooklyn, N. Y., for plaintiffs-appellants.
 John A. Wilson, New York City (Shearman & Sterling, New York City, Michael J. DeSantis and John S. Williams, New York City, of counsel), for defendant-appellee Monsanto Co.
 Roy H. Steyer, New York City (Sullivan & Cromwell, David W. Peck and James W. Bowers, New York City, of counsel), for individual defendants-appellees.
 John L. Davidson, Jr., St. Louis, Mo., of counsel, for defendant-appellee Mercantile Trust Co. National Association, as Executor.
 Before MOORE and SMITH, Circuit Judges, and WEINFELD, District Judge.*
 J. JOSEPH SMITH, Circuit Judge:
 
 
 1
 This is an appeal from the order of Judge Weinstein of the United States District Court for the Eastern District of New York, April 7, 1969, granting defendants' motion for summary judgment on the merits and ordering that the action be disallowed as a class action.
 
 
 2
 The named plaintiffs in this purported class action bought and sold between December, 1964 and October, 1966, small amounts of common stock[1] in the defendant Monsanto Company, a major diversified chemical producer whose stock is traded on the New York Stock Exchange. The individual defendants were officers and directors of the defendant company during the relevant period.
 
 
 3
 Plaintiffs brought this action under section 22(a) of the Securities Act of 1933, 15 U.S.C. § 77v(a), and under section 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa, for alleged violations by the defendants of sections 5, 12, and 17 of the the Securities Act of 1933, 15 U.S.C. §§ 77e (selling securities without a registration statement being in effect), 77l (selling securities "by means of a prospectus or oral communication, which contains an untrue statement of material fact"), and 77q (scheme to defraud in the sale of securities), of sections 9, 10(b), 16, 18 and 29 of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78i (manipulating securities prices), 78j (using manipulative and deceptive devices in connection with the purchase or sale of securities), 78p (directors and officers must file a monthly report indicating any change in their holdings in their own companies), 78r (liability for misleading statements), and 78cc (invalidity of any contract made in violation of any provision in this chapter), of Rules 10b-5 and 16a-1 of the Securities and Exchange Commission, 17 C.F.R. §§ 240.10b-5 (employing manipulative and deceptive devices and making an untrue statement of material fact or omitting to state a material fact), and 240.16a-1 (filing of statements by officers, directors, and principal shareholders), and of unspecified sections of the rules of the New York Stock Exchange.
 
 
 4
 The essence of plaintiffs' allegations is that the defendants engaged in a scheme to inflate the selling price of Monsanto stock from late 1964 until late 1966 by making false or misleading statements and by omitting to release material, accurate information as to the actual and forecast market performance of Monsanto. During this period, the individual defendants, officers and directors of Monsanto who had access to the correct data, were selling large numbers of shares from their own personal holdings in Monsanto.[2]
 
 
 5
 The parties made cross-motions under Rule 23(c) (1) of the Federal Rules of Civil Procedure as to whether the action could be maintained as a class action. After submission of a brief amicus by the Securities and Exchange Commission and a hearing, Judge Weinstein ruled, in an extensive opinion, that he would postpone the decision on the motions pending a two-stage preliminary evidentiary hearing, with "controlled discovery," which would reveal the plaintiffs' chances of ultimate success. Dolgow v. Anderson, 43 F.R.D. 472 (E.D.N.Y.1968). In the first stage plaintiffs were to show that predictions by defendants of Monsanto's future economic performance did not come true. In the second stage plaintiffs were to show that defendants' estimates and predictions were unreasonable and that their transactions in Monsanto shares were suspicious or unusual.
 
 
 6
 The two stages were in reality confounded into one at the evidentiary hearing which took place December 18-20, 1968. At the conclusion of the hearing, Judge Weinstein asked the defendants to move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, which they did on February 24, 1969. [The defendants also renewed their motion to disallow the class action.] Upon conclusion of the argument on the motions, March 17, 1969, Judge Weinstein, from the bench granted the motions for summary judgment and disallowed the class action.
 
 
 7
 Judge Weinstein stated that all of the relevant facts had been developed, that further discovery or hearings would be cumulative, and that construing all evidence most favorably to the plaintiffs, there was no evidence to support their charges, and no reasonable jury or court could find that their rights had been violated. No written opinion was filed.
 
 
 8
 After careful consideration of the lengthy record in this case, we conclude that there are genuine issues of material fact raised in plaintiffs' complaint and supporting affidavits, and that plaintiffs have "set forth specific facts showing that there is a genuine issue for trial." Rule 56(e), Federal Rules of Civil Procedure; see First National Bank of Arizona v. Cities Service Co., 391 U.S. 253, 288-290, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968). We therefore reverse the judgment below and remand with instructions to reconsider the cross-motions as to whether the action may be maintained as a class action and to permit appropriate further discovery prior to trial.
 
 
 9
 The heart of plaintiffs' factual case consists of a compilation of statements made by several defendants, officers and directors of Monsanto, from late 1964 to early 1967, which predicated Monsanto's future performance in terms of such financial indicators as sales, net income or earnings, per share earnings, and capital expenditures. They compare these predictions to the company's actual performance, as revealed by the company's regular reports and by data obtained through discovery, and show that the predictions were often in error and overly optimistic. They also point to a schedule of the purchases and sales of the individual defendants from September, 1964 to February, 1967, and show that defendants indeed were selling large numbers of shares of Monsanto stock during the period as well as exercising their stock options years before the options were due to expire, and frequently selling the shares purchased on the options shortly after the six-month short-swing sales period had elapsed. Almost all of the sales by defendants occurred while Monsanto stock was at record high levels (above $80) and prior to its precipitous fall starting in February, 1966 down to $39.70 in November, 1966.
 
 
 10
 Defendants' response initially seems to have been to challenge plaintiffs' factual case on the merits, not to contend that there was no genuine issue of fact raised by the plaintiffs. Their response contains a detailed analysis with supporting data of all the allegedly inaccurate predictions made by the defendants. They correctly point out that several of the statements, primarily those dealing with expanding sales, when accurately read, are not overstatements of actual future performance.
 
 
 11
 As to other statements, defendants admit that predictions of future earnings, earnings per share, and capital expenditures, were not borne out by economic events. They argue however that the predictions made public were based on contemporary budgets and estimates within the company, based on the best data available at the time of the statements. The fact that the predictions failed to come true was allegedly due to unforeseeable business setbacks in the latter halves of 1965 and 1966 which were caused by general market conditions, increased domestic and foreign competition in certain product markets and the resulting "softness" in the price of those products. But as to several of the public predictions, the defendants candidly admit that the predictions exceeded even the contemporary intra-company estimates.[3]
 
 
 12
 Defendants further show that when the above-mentioned business fall-offs occurred and Monsanto's performance fell below its budget, the company revised down its public predictions to make them congruent with intra-company estimates.
 
 
 13
 Defendants also contend that the pattern of selling by defendants in the period is in line with their transactions in Monsanto stock in previous periods. However, the record contains the pre-1964 stock transactions of only four defendants. They contend further that the sales were not motivated by knowledge of inside information indicating imminent doom, but rather by innocent motives such as a desire to diversify their holdings, to obtain cash, to pay back loans which were taken to finance predeadline purchases under stock options, and to trade Monsanto holdings for other securities. These alleged innocent motives are not inconsistent with plaintiffs' allegations that they were selling on the basis of material inside information which was not made public.
 
 
 14
 Defendants finally contend that the aggregate holdings of the defendants actually increased during the period. The increase was due to purchases under stock options prior to the expiration of those options. Such purchases, however, are consistent with a "bearish" or pessimistic outlook on the stock's future. See Lorie & Niederhoffer, Predictive and Statistical Properties of Insider Trading, 11 J. of Law & Econ. 35, 44-45 (1968).
 
 
 15
 While defendants' evidence may establish at trial that they acted reasonably, revealed only accurate predictions, and did not trade in Monsanto stock while in possession of material inside information not generally available, we hold that plaintiffs have set forth specific facts which appear to us in the present state of the record to at least raise these issues.
 
 
 16
 We need detail only several pieces of evidence to demonstrate that summary judgment for defendants was erroneously granted. First, late in 1964 Monsanto began to expand its capital expenditures, which resulted in a large increase in "start-up" costs in 1965 over previous years. Second, due to this expansion, Monsanto benefited from a greatly increased investment tax credit in 1965 ($14.2 million in 1965 as opposed to $6.05 million in 1964). And third, Monsanto benefited from two substantial non-operating income items in 1965: a $2.3 million gain on the condemnation of property and a $0.8 million net gain after taxes from the charitable contribution of appreciated property. (Net income for 1965 was $122 million.)
 
 
 17
 Monsanto's quarterly reports contained figures which were affected by these factors. And it was publicly announced in December, 1964 that lower tax rates and higher investment tax credits would bolster earnings for 1965 and that this would be offset somewhat by increased start-up costs. However, the precise amounts that these factors contributed to or detracted from the reported earnings were not disclosed in the quarterly reports; the reports revealed only that the tax benefits were offset to some degree by the extra start-up costs. In the annual report for 1965, released in February, 1966, the company disclosed for the first time the amount these factors affected income, and then the amounts were expressed in terms of their percentage influence relative to their 1964 influence. No precise dollar figures were disclosed.
 
 
 18
 Defendants point to expert testimony at the hearing that their reports comport with accepted accounting practices. This may be so. Although the provisions for taxes in the quarterly reports showed lower figures than those in 1964, they did not reveal what portion of the decrease in tax provision was due to the non-recurring high investment tax credit. The fact remains, however, that the individual defendants had access to more precise figures than were released, and that they were selling major portions of their personal holdings of Monsanto stock during this period.
 
 
 19
 The inference which must be afforded the plaintiffs, the party opposing the motion for summary judgment, in the light of defendants' heavy sales, is that the precise figures available to defendants and not the public were material as to the selling price of the stock. SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, 851 (2d Cir. 1968) (en banc).
 
 
 20
 Finally, defendants rely heavily on contemporary company estimates as a justification for what turned out to be overly optimistic public predictions. If on summary judgment such contemporary company estimates could justify the predictions, and the plaintiffs are not given an opportunity to examine the raw cost and product sales figures which went into the computation of the company estimates, company officials could well benefit by permitting the company to make inaccurate internal estimates while using the raw data for their own analysis of the company's prospects. We hold that on motion for summary judgment these contemporary internal corporate estimates cannot justify Monsanto's public predictions when plaintiffs charge that the company had data available which would have substantiated a less optimistic prediction at the time.
 
 
 21
 As we said in SEC v. Texas Gulf Sulphur Co., supra, 401 F.2d at 850 n. 12, the company is entitled to keep such cost and product sales data confidential for valid competitive reasons on behalf of the corporation. But the defendants are not entitled to sell their shares on the basis of this confidential information, if this information is material. Since plaintiffs have thus far been denied discovery of this data, we cannot conclude at this stage of the proceedings that the data was not material.
 
 
 22
 It is true that plaintiffs had a wide latitude in developing facts, building a record of some ten volumes. But their discovery was not unrestricted, and even had it been, determination of issues which apparently existed cannot properly be reviewed without detailed findings and conclusions by the court. While it is true findings of fact are not required on a Rule 56 motion,[4] it would have been of much aid upon this appellate review had the district court followed through on its announced purpose to file a written opinion; this perhaps would have delineated those material facts as to which it had determined that no genuine issue of fact existed.[5]
 
 
 23
 While it may in the end turn out that the result was correct and that the issues must be resolved against the plaintiffs, and it is a great temptation to a court which has spent much time and effort on such a matter to cut the Gordian knot and dispose of it summarily, Rule 56 does not permit this disposition here.
 
 
 24
 Thus we conclude that plaintiffs are entitled to a trial in this action and that summary judgment was erroneously granted for defendants. Since the lower court's order disallowing the maintenance of the action as a class action was premised on the grant to defendants of summary judgment, that order is also reversed. Although a lengthy technical trial may seem fruitless when plaintiffs' prospect of ultimate success on the merits might be viewed as small, we recall the words of Judge Frank:
 
 
 25
 "* * * trial judges should exercise great care in granting motions for summary judgment. A litigant has a right to a trial where there is the slightest doubt as to the facts, and a denial of that right is reviewable; but refusal to grant a summary judgment is not reviewable. Such a judgment, wisely used, is a praiseworthy time-saving device. But, although prompt dispatch of judicial business is a virtue, it is neither the sole nor the primary purpose for which courts have been established. Denial of a trial on disputed facts is worse than delay. * * * The district courts would do well to note that time has often been lost by reversals of summary judgments improperly entered." Doehler Metal Furniture Co. v. United States, 149 F.2d 130, 135 (2d Cir. 1945).
 
 
 26
 Reversed and remanded.
 
 
 
 Notes:
 
 
 *
 Of the Southern District of New York, sitting by designation
 
 
 [1]
 Plaintiffs Mildred and Benjamin Dolgow jointly own 23 shares and plaintiff Sarah Fischer owns 72 shares of Monsanto common stock. In connection with stock dividends on their holdings, and in order to round out their fractional holdings from such dividends, the Dolgows and Mrs. Fischer purchased one share of Monsanto common stock in December, 1964, and in December, 1965. Plaintiff Reuben Isaacson purchased 300 shares of Monsanto common stock on April 9, 1965 and sold the 300 shares on October 5, 1966
 
 
 [2]
 In one instance, defendant Queeny apparently neglected to report his sale of 5,000 shares of Monsanto stock in September, 1965, in violation of SEC Rule 16a-1 and 15 U.S.C. § 78p. Plaintiff Fischer allegedly relied on Queeny's failure to report when she rounded out her fractional share in December, 1965
 
 
 [3]
 For example, defendant Lucas on September 24, 1966 publicly estimated that the capital expenditures for 1966 would be around $235 million, while the company's August, 1966 estimates were $220 million and a public announcement in August, 1966, estimated a figure of $210 million. A similar public statement by Lucas on October 13, 1965 predicted capital expenditures of around $290 million for 1966 when contemporary company estimates were $245.3 million
 
 
 [4]
 Rule 52(a), Federal Rules of Civil Procedure
 
 
 [5]
 Upon granting the summary judgment motion, Judge Weinstein stated: "It is my present intention to write an opinion on this, analyzing the claims and information for whatever assistance it may give to the parties and should an appeal be taken to the Court of Appeals." App. Vol. X, p. 1461S. See SEC v. Frank, 388 F.2d 486, 493 (2d Cir. 1968)
 
 
 MOORE, Circuit Judge (dissenting):
 
 27
 The majority opinion ends with "Reversed and remanded" but remanded for what? This case should not be a theoretical vehicle for an abstract discussion of certain fundamentals pertaining to the nature of a summary judgment motion. A proper decision here, in my opinion, calls for an examination of the actual proceedings conducted in the trial court in the light of reality — not the theoretical.
 
 
 28
 Of initial importance is the fact that all the judges of the Eastern District of New York are on an individual calendar basis — a system more and more being adopted throughout the country because of its proven success in the expedition of the disposition of the courts' heavy caseload. Thus from its inception until its ultimate termination, this case was, is and will be the responsibility of Judge Weinstein. It is he who must exercise his discretion as the trial judge as to whether the case can be regarded as a class action and, if so, what the classes should be. It is he who must decide the nature and scope of the issues, the extent of the testimony which may bear on those issues, the extent of discovery to elicit the facts, the relevance of proffered testimony, the admission or rejection of cumulative testimony and all matters which relate to the development of the facts which he regards as essential to his decision.
 
 
 29
 This suit was commenced on November 11, 1966. In August 1967, the defendants asked the Court to declare that "this action is not to be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure." Plaintiffs countered with a motion claiming that a decision on a motion as to a class action would be premature "prior to initiation of discovery proceedings" and, in the alternative, for a declaration that the suit should be regarded as a class action. On its own initiative the Court invited the Securities and Exchange Commission to submit a brief as amicus on the class action issue. In a lengthy decision, 43 F.R.D. 472 (E.D.N.Y. January 3, 1968), Judge Weinstein postponed the determination of this question pending a preliminary hearing — a procedure to which both parties agreed.
 
 
 30
 Prior to this time, plaintiffs had availed themselves of discovery procedures including some twelve sets of interrogatories and had obtained from defendants over 7,600 pages of documents. In addition, they had taken the depositions of the President and a Vice-President of Monsanto (some 1,500 pages). All these proceedings were under the supervision of Judge Weinstein who passed upon plaintiffs' applications.
 
 
 31
 Despite this exhaustive inquiry by plaintiffs into the facts, Judge Weinstein gave them a further opportunity directly to examine Monsanto's officers at an evidentiary hearing. The officers included the President, a Vice-President, the President and Vice-President of a subsidiary division, and the representative of the Estate of a deceased officer. The Court also gave to plaintiffs the privilege of calling additional witnesses.
 
 
 32
 Evidentiary hearings were held on December 18, 19 and 20, 1968. All material previously submitted was made part of the record and eight witnesses were subjected to direct and cross-examination. The record before us consists of 10 volumes. After almost two years of intensive fact exploration and development, Judge Weinstein suggested motions by both parties for summary judgment. Lengthy oral arguments were had. The Court then ruled:
 
 
 33
 "I am satisfied that all the relevant facts have been developed. Any further discovery or hearings would be cumulative. There is no suggestion that any relevant avenue of inquiry has not been sufficiently explored to indicate whether any relevant evidence might be devloped from further exploration.
 
 
 34
 "It is clear that despite the imagination and forceful advocacy of the Plaintiffs' attorney, there is no evidence to support their charges. Construing every scrap of evidence that was revealed or that might be revealed in a way most favorable to Plaintiffs indicates no evidence to support their charges. All that the Plaintiffs have shown — and this at most is that in hindsight their business judgments might have been different than those of Defendants.
 
 
 35
 "Defendants demonstrated that no reasonable juror or Court could possibly find anything but that they have not violated any of the rights alleged in the complaints supplemented by the affidavits of the Plaintiffs."
 
 
 36
 On March 24, 1969, plaintiffs moved for a rehearing. Plaintiffs' supporting affidavit was merely an argument based on facts already adduced urging the Court to adopt plaintiffs' conclusions. The Court denied the motion, saying: "The issues raised in the moving papers were considered by the Court."
 
 
 37
 On April 7, 1969, the Court signed an order granting defendants' motion that "the action shall not be maintained as a class action" and on the same day granted summary judgment in favor of defendants "on the grounds that there is no genuine issue as to any material fact and that the defendants are entitled to judgment as a matter of law." Rule 56 was thus satisfied.
 
 
 38
 Despite the fact that under the individual assignment practice in the Eastern District, Judge Weinstein was, is and will be the trial judge, the majority, in effect, substitute themselves as trial judges and would relegate his position to that of a puppet with no discretion to decide whether evidence was cumulative, whether further discovery was appropriate, whether certain evidence was material and whether the plaintiffs' suit should be maintained as a class action. The law is quite to the contrary and a host of decisions support the trial judge's discretion in each category. The trial judge should have discretion to decide whether further evidence would be merely cumulative. Even broader is his discretion to control the limits of discovery. How else could a plaintiff's insatiable curiosity or desire to harass be kept within reason or checked? Of particular importance is the role of the trial judge in deciding whether or not to try the case as a class action. The trial and the formulation of appropriate issues are his responsibility.
 
 
 39
 The majority write that plaintiffs' "discovery was not unrestricted." But surely an appellate court should not issue a pronouncement, despite the law to the contrary, that restrictions placed upon discovery constitute reversible error as a matter of law. Particularly should this be true here, where a year or more of intensive discovery was followed by three days of hearing with examination and cross-examination of key witnesses and no restriction placed by the Court as to other witnesses whom plaintiffs might have desired to offer.
 
 
 40
 In my opinion the majority misconceive the purpose of Rule 56 and Judge Weinstein's procedure thereunder. The Rule places within the power of the court to decide whether any material issues of fact remain to be resolved by a trial. Virtually all (in fact all would not be an unfair characterization) the cases of summary judgment involve situations — even as those specifically mentioned in Rule 56 — put before the courts on pleadings, affidavits and depositions. Of course, where issues of fact remain unresolved, summary judgment has been held to be inappropriate. In complete contrast is this case. Here Judge Weinstein, to satisfy himself that no factual issue was undeveloped, allowed not only the broadest discovery but, in effect, conducted a trial to give plaintiffs an opportunity to present all facts bearing upon the material issues. Only then did he issue his judgment.
 
 
 41
 The majority are faced with this dilemma. They recognize that "plaintiffs had a wide latitude in developing facts, building a record of some ten volumes." But then anomalously they say that "determination of issues which apparently existed cannot properly be reviewed without detailed findings and conclusions by the court." However, it was these so-called issues which Judge Weinstein gave plaintiffs every opportunity to develop. On the merits they failed. Therefore, on the proceedings before him as the Judge in charge of the case, he found that no open issues of fact remained — hence, he was entitled to give judgment, analogous to a directed verdict. If, on the other hand, the trial was merely to supplement the Rule 56 material, then he was entitled to rely upon Rule 52(a) which reads in part: "Findings of fact and conclusions of law are unnecessary on decisions of motions under Rules 12 and 56 * * *." If then, as the majority state, Judge Weinstein's determination of the issues "cannot properly be reviewed without detailed findings and conclusions by the court," they should at least give him the opportunity to submit them.
 
 
 42
 Finally, what should be done? I would affirm. My belief, however, has not prevailed. What should Judge Weinstein do? Surely he should not be asked to repeat the ten volumes already constituting the record. Nor should he be asked to acquiesce abjectedly in plaintiffs' further demands for discovery no matter how cumulative or quixotic. Plaintiffs' motion for a rehearing established that it brought forward no new matters not already passed upon.
 
 
 43
 At a time when the courts should be looking at "substance" rather than at "form," how can the majority reconcile their opinion that "a lengthy technical trial" should be held when to the extent of ten volumes it already has been held and plaintiffs have been unable to produce more than their disagreement with the Court's well-grounded conclusions. Although I accept Judge Weinstein's conclusion that "there is no genuine issue as to any material fact" (meaning, of course, that the facts upon which he based his legal conclusions were not in issue) — and hence I would affirm, since there is to be a remand, in my opinion it should be qualified and limited to the introduction of such further proof as in the judgment of the trial court may be tendered by the parties upon, and relevant to, the issues as framed and for the submission of findings of fact and conclusions of law thereon. In all likelihood the course of any future proceedings will follow these lines in any event.
 
 
 44
 As for the class action phase under Rule 23, the Court at any stage has the right to decide whether the suit be an appropriate class action. After hearing hundreds of pages of argument and testimony, the Court has so decided. This decision is within his discretion and should be affirmed.
 
 On Petition for Rehearing
 SMITH, Circuit Judge:
 
 45
 The petition for rehearing emphasizes the trend toward more liberal treatment of the trial court's summary judgment powers illustrated by our interpretation of amended Rule 56 in Dressler v. M. V. Sandpiper, 331 F.2d 130 (2d Cir. 1964) and American Manufacturers Mutual Ins. Co. v. American Broadcasting-Paramount Theatres, Inc., 388 F.2d 272 (2d Cir. 1967). We have no quarrel with this trend, and have not departed from it in our opinion here. The petition, however, also points to instances where apparent issues pointed out in our opinion may in fact have been considered by the trial court to have been denuded of substance by evidence before it, such as the extent of review of the raw data by others than defendants, and the evidence as to revelation of start-up costs, investment tax credit and treatment of proceeds of sale of land.
 
 
 46
 We agree that if the apparent issues are indeed sham, and the record may properly be read to support findings to that effect, no purpose would be served by further lengthy and costly proceedings. Appellees make an alternative suggestion that a remand for such findings might lay a foundation for reconsideration of our opinion. We find merit in the suggestion, particularly in view of Judge Weinstein's statement that it was his "intention to write an opinion * * * analyzing the claims and information for whatever assistance it may give to the parties and should an appeal be taken to the Court of Appeals." We therefore modify the opinion and order to provide for remand for the preparation of findings and conclusions in accordance with Judge Weinstein's original intention announced at the time of the ruling on the motion for summary judgment. Petition for rehearing granted to the extent above indicated. Otherwise denied. Reversed and remanded for findings and conclusions.