Morton **EISEN**, on behalf of himself and all other purchasers and sellers of "odd-lots" on the New York Stock Exchange similarly situated, Plaintiff,

v.

**CARLISLE & JACQUELIN** and DeCoppet & Doremus, each limited partnerships under New York Partnership Law, Article 8, and New York Stock Exchange, an unincorporated association, Defendants.

66 Civ. 1265.

United States District Court,
S. D. New York.

April 4, 1972.

Mordecai Rosenfeld, New York City, and Harold E. Kohn, Philadephia, Pa., for plaintiff.

Carter, Ledyard & Milburn, New York City, for defendant Carlisle & Jacquelin.

Kelley, Drye, Warren, Clark, Carr & Ellis, New York City, for defendant De-Coppet & Doremus.

Millbank, Tweed, Hadley & McCloy, New York City, for defendant New York Stock Exchange, Inc.

## OPINION

TYLER, District Judge.

This case is currently on remand from the Court of Appeals for class action determination. In deciding whether this case could be maintained as a class action, this court was directed to consider " . . . questions of notice, adequate representation, effective administration of the action, and any other matters which the District Court may consider pertinent and proper." Eisen v. Carlisle & Jacquelin, 391 F.2d 555, 570 (2d Cir., 1968). After able response by the parties to these and other issues, it was decided that this case could and should be maintained as a class action. Eisen v. Carlisle & Jacquelin, 52 F.R.D. 253 (S.D.N.Y., 1971); at the same time, however, decision on the issue of the allocation of the costs of notice of that status to the class was reserved. Specifically, in recognition of the fact that cost of notice as required might impose unfair burdens upon either plaintiff or defendants, it was decided to hold a preliminary hearing on the merits to determine whether, and, if so, how, such costs might be allocated among the parties. In this preliminary hearing, the parties were afforded the opportunity to present evidence showing " . . . 'the likelihood that one party or the other would prevail at trial' . . ." Dolgow v. Anderson, 43 F.R.D. 472, 502 (E.D.N.Y., 1968). If, after the hearing, the evidence showed that the " . . . chances of ultimate success of plaintiff and the class were sustained", Dolgow v. Anderson, 438 F.2d 825, 827 (2d Cir.,

1971), defendants would be required to pay all or part of the costs of notice. Eisen v. Carlisle & Jacquelin, *supra*, 52 F.R.D. at 272.

▮ The "mini-hearing", as this preliminary hearing has come to be termed, was held on February 9, 1972. No oral testimony was taken, the parties preferring intead to rely on submission of voluminous documentary evidence. Argument by counsel was heard, and briefs were submitted thereafter. There follow findings of fact and conclusions of law concerning plaintiff's anti-trust and "failure to regulate" claims which are based on evidence currently before this court. They may be considered binding on the parties and court only for the stated purpose of the hearing; the allocation of the cost of notice. Thus, they may not be considered to prejudice any party's right to introduce more evidence and proffer further argument when the merits are reached for final determination.[1]

Briefly stated, plaintiff asserts that he and the class were injured by various anti-competitive practices of defendants. Specifically, plaintiff complains that in establishing differentials to be added to the price of odd-lot stock traded over the New York and other exchanges, defendants were guilty of *per se* violations of the antitrust laws. Plaintiff further complains that the class was injured by the New York Stock Exchange's alleged failure to regulate odd-lot transactions as it is required to do by the terms of the Securities Exchange Act of 1934 ("the Act").

▮ On the basis of the evidence presently before the court, I conclude that plaintiff class is more than likely to prevail on both of these claims and that defendants must therefore bear the major share (90%) of the cost of notice to the class.

## FINDINGS OF FACT

1. The defendant odd-lot firms, Carlisle & Jacquelin and DeCoppet & Doremus, (the "odd-lot defendants"), during the years 1960 to 1966 enjoyed a monopoly of odd-lot transactions over the New York Stock Exchange ("the Exchange").

2. Prior to the enactment of the Act, the differentials charged by odd-lot firms operating over the Exchange were set by agreement among the firms themselves with the approval of the Board of Governors of the Exchange. This procedure was not essentially changed after the enactment of the Act until 1966 when the Exchange adopted a rule establishing odd-lot differentials.

3. The Exchange in 1934 filed a registration statement with the Securities and Exchange Commission. In that document and in annual amendments filed with respect thereto, the Exchange described its regulation of odd-lot firms as follows:

> "Transactions in odd-lots are effected on this Exchange under methods which have been prescribed by the odd-lot brokers and dealers with the *acquiesence* of the Exchange." (emphasis supplied)

4. Prior to 1964, the Exchange had adopted five rules pertaining to odd-lot transactions. None of these rules in any way pertained to or sought to regulate the differentials to be charged in odd-lot transactions. These five rules, which can only be said to apply to peripheral matters, constituted the only formal regulation of odd-lot brokers and dealers by the Exchange.

5. Prior to its adoption of Exchange Rule #125 in 1964, the Exchange was the only national exchange not to have established rules regulating odd-lot differentials.

---

1. Plaintiff's counsel have argued that the merits of this case can be reached on motions for summary judgment—and that the present record before the court is complete for such resolution. Even if this be true, this court declines, as stated in the text, to treat this case on the merits at this juncture.

6. In 1938, in addition to the two odd-lot defendants, four smaller specialist firms were also transacting odd-lot business on the Exchange. These smaller firms, which at that time accounted for 2½% of all odd-lot business on the Exchange, had adopted the practice of absorbing transfer taxes in their odd-lot sales. The odd-lot defendants, who chose not to absorb these costs, complained of these competitive practices to the Exchange's Committee on Floor Practice. After confidential hearings, the Committee decided:

" . . . that the differentials at which odd-lot dealers do business should be the same. The Committee believes that price competition between odd-lot dealers is detrimental to the best interests of the Exchange and a cause of embarrassment and inconvenience to a substantial number of members."

The Committee then decided that henceforth it would be the policy of the Exchange to " . . . withdraw the registration as odd-lot dealer of any member who transacts odd-lot business at differentials less than those at which the odd-lot business of the Exchange is usually transacted." The effect of this determination, not surprisingly, was that the smaller odd-lot firms were forced to charge the same differential as the odd-lot defendants.

7. The 1938 Committee report, hearings, and the policy generated thereby were never disclosed to the public. Indeed, the Commission, which was not notified by amendment to the Exchange's registration statement or by any other official means, apparently first became aware of this policy during the course of its Special Study investigations.

8. While there has been no price competition between odd-lot firms since 1938, the firms have competed in terms of services provided for commission houses. The benefits of these services, which include interest free loans and market information, enure to the commission houses rather than to investors. On the other hand, the differentials, which are not paid by commission firms, affect only the investing public.

9. The 1938 Committee policy or "ruling" had a devastating effect upon the smaller odd-lot firms which did not have the resources to compete with the odd-lot defendants in services and thus were dependent upon some sort of price competition in order to attract and maintain business. The Exchange policy, which foreclosed price competition, insured the ultimate demise of the smaller odd-lot firms.

10. In 1941, the odd-lot dealers decided to increase the differential on stock selling below $1.00. Upon receipt of notice of this increase from the Exchange, the Commission inquired as to whether public disclosure of the new differential would be announced to the public. In response to this query, the Exchange replied as follows:

"The Exchange has not had, nor does it now have, any rules fixing the differential at which odd-lot dealers in 100 share unit stocks should deal, since this has been and is regarded solely as a matter between the odd-lot dealers and the commission houses with which they deal. Therefore, it is felt that it would be inappropriate for the Exchange to take any action with respect to either approving or disapproving the present proposed change."

11. In 1950, the Commission's then Director of the Division of Trading and Exchanges wrote the Exchange: "[W]e feel that the Exchange should consider the advisability of adopting rules, regulations, or interpretations reduced to writing which would govern the existing operational methods" of the odd-lot dealers. The Exchange replied that it was reluctant to do so and the matter was dropped until the Exchange adopted Rule 125 at the Commission's request in 1964.

12. Prior to July, 1951, odd-lot firms charged a differential of ⅛ point on all stock selling for more than $1.00. In 1947, the odd-lot defendants began discussing the feasability of increasing the differential. By December, 1950, the odd-lot defendants had agreed between themselves to increase the differential to ¼ point on all shares selling for more than $60.00. The proposed $60.00 breakpoint was informally presented by the odd-lot defendants to the Exchange, but was not mentioned to the other firms also engaged in odd-lot transactions over the Exchange. The Exchange disclaimed jurisdiction over the proposed differential increase but informally expressed the opinion that it had no objection to its implementation. Thereupon, the odd-lot defendants decided to seek approval of their proposed increase of differentials from the Commission. Accordingly, they jointly hired counsel who presented their case to the Commission. While doubting that it had jurisdiction, the Commission stated that it had no objection to implementation of the new differentials.

13. The odd-lot defendants, realizing that they would lose business if odd-lot firms on other exchanges continued to charge a lower differential, sought to have the other exchanges raise their differentials to accord with their own. The odd-lot defendants turned first to the Midwest Exchange ("Midwest"), which had been considering conversion to a decimal differential system which, in some cases, would have offered cheaper rates to investors. Midwest, which had its own reasons for wanting a decimal system, at first refused to accept the differentials proposed by the odd-lot defendants. After protracted and fruitless negotiations, the odd-lot defendants told Midwest that they would be willing to drop the breakpoint below $60.00 but, if Midwest did not come to terms, they would increase their differential only on stock not traded over regional exchanges —thereby increasing their profits without conferring benefit upon members of Midwest and other regional exchanges. Midwest capitulated and agreed with the odd-lot defendants to accept a breakpoint of $40.00.

14. As a part of their agreement, Midwest undertook to insure that all of the western exchanges would agree to charge the new differential with the $40.00 breakpoint. The odd-lot defendants agreed to see to it that the eastern exchanges did likewise. The president of Midwest also sought Commission approval for the new rates to be charged on all exchanges. On July 16, 1951, the Commission advised that it would not object to a $40.00 breakpoint.

15. Of all the regional exchanges approached by Midwest and the odd-lot defendants, only the Boston Exchange ("Boston") refused to raise its differentials. Boston's members reasoned that if their odd-lot differentials were lower, they might expect additional odd-lot business to come their way. Accordingly, on July 9, 1951, the Boston odd-lot traders unanimously resolved that they would not increase their differentials.

16. The president of the Boston Exchange informed the Exchange that Boston would not advertise its lower differential in order to increase its odd-lot business. Boston's president has testified on another occasion that he made this promise in fear of retaliation from the Exchange. This concern stemmed in part from the Exchange's threat in 1940 to restrict the use of its members' funds in odd-lot transactions on other exchanges. Furthermore, many of Boston's members relied upon the Exchange for financing, up to date price quotations and the clearing facilities of various dual memberships.

17. On the regional exchanges, odd-lot transactions are handled by stock specialists instead of specialized odd-lot firms as they are on the Exchange. Odd-lot business is very important to these regional specialists and to the exchanges

on which they operate. For example, while odd-lot transactions accounted for about 10% of the Exchange's business, they approximated 48% of Boston's share volume.

18. On July 20, 1951, representatives of the odd-lot defendants and the Exchange met to discuss notice of the increased differentials. At this meeting, the Exchange disassociated itself from the release, but agreed to respond to public inquiry concerning the increase. In order to be able to answer such questions, the Exchange, which theretofore apparently had neither sought nor received any data to support the new differentials, requested that the odd-lot defendants furnish information in support of the increase at that late date.

19. Shortly before the increase was publicly announced, the then existing smaller odd-lot firms trading over the Exchange were informed for the first time of the raised differentials and asked to sign the announcement. One such firm refused to sign, but, fearful that it would be suspended in accordance with the 1938 Committee policy, went along and charged the increased differential.

20. On July 25, 1951, the odd-lot firms issued a release addressed to member firms of the Exchange announcing that they were going to charge new differentials. This release apparently invited no public discussion and none ensued, perhaps because the release was virtually simultaneous with the effective date of the increase.[2]

21. In August, 1951, the Boston Exchange, despite its ban on advertising, began to experience an increase in odd-lot business. This created some dissention in the Boston ranks. Some of the Boston dealers, particularly the smaller ones, began to urge advertisement of the lower differentials in effect on their exchange in order to increase business. The larger Boston brokers, who had dual memberships and were more sensitive to pressure from the Exchange, advocated that Boston's differential be raised to correspond with that charged elsewhere.

22. In October, 1951, the Boston Governing Committee polled its members to see whether Boston should also raise its differentials. The result of the poll was 42 to 41 in favor of retention of the ⅛ point differential. Nevertheless, Boston raised its rates shortly thereafter, claiming that the dealers who had voted for the higher differential, although numerically a minority, actually conducted 75% of the odd-lot business.

23. In 1956, the Exchange engaged Ebasco Services, Inc. to study Exchange methods and make proposals for their modernization. In due course, Ebasco studied odd-lots and made proposals for modernization of odd-lot procedures. The odd-lot defendants, fearing a decrease of the differential among other things, opposed the Ebasco proposals and succeeded in defeating implementation thereof. Although the differentials were reduced in 1966, the Ebasco proposals, which would have substantially cut the costs of odd-lot transactions, remain unconsidered and unimplemented.

## CONCLUSIONS OF ULTIMATE FACT AND LAW

1. The odd-lot defendants fixed the differentials or prices to be charged in odd-lot transactions over the Exchange. These rates which were fixed in 1951 were in effect until 1966.

2. The odd-lot defendants fixed the differentials to be charged on other ex-

---

2. Nowhere in the evidence before me do I find the full text of the July 25, 1951 release or the effective date of the new differentials. I infer, however, from the SEC Special Study and the portion of the release contained therein, that notice of the new differentials and the implementation thereof were nearly, if not actually, simultaneous. SEC, Report of Special Study of Securities Markets, H.R. Doc. No. 95, Pt. 2 at 183 (1963).

changes in 1951. These differentials were also in effect in the early 1960's.

3. The Exchange was an active participant in these price fixing arrangements. This participation took the form of failure to regulate, acquiescence in the increase, and maintenance of its 1938 policy of enforcing the odd-lot defendants' rates upon others.

■ 4. Plaintiff and the class have established that they may likely carry their burden of producing evidence that the defendants fixed prices. Under the *per se* rule, once this showing has been made, judgment must follow and the court need not consider any defenses such as the reasonableness of the price formula or the fact that the public has not been harmed. United States v. National Association of Real Estate Boards, 339 U.S. 485, 70 S.Ct. 711, 94 L.Ed. 1007 (1950); United States v. Trenton Potteries, 273 U.S. 392, 47 S.Ct. 377, 71 L.Ed. 700 (1927).

■ 5. Defendants urge this court to apply the rule of reason, which " . . permits the courts to decide whether conduct is significantly and unreasonably anti-competitive in character and effect." Report of The Attorney General's National Committee To Study the Antitrust Laws, 11 (1955). The rule is not, however, unlimited in scope and will operate to excuse only conduct that can be shown to be incidental or ancillary to competition. See, e. g. Appalachian Coals, Inc. v. United States, 288 U.S. 344, 53 S.Ct. 471, 77 L.Ed. 825 (1933). The rule of reason almost certainly is inapplicable to this case, however, since price fixing agreements are conclusively presumed anti-competitive in both purpose and effect. See United States v. Trenton Potteries, Co., *supra* 273 U.S. at 396–398, 47 S.Ct. 377. "In such cases, inquiry under Rule of Reason is over once it has been decided that the conspiracy or agreement under review in fact constitutes price rigging . . ." Report of the Attorney General, *supra* at 11.

Defendants also argue that application of the rule of reason to an allegedly analogous situation in United States v. Morgan, 118 F.Supp. 621, 688–691 (S.D.N.Y., 1953) indicates that it should pertain here. In *Morgan*, however, Judge Medina found that the restraints there at issue affected neither competitors nor market prices. *Ibid.*, 118 F.Supp. at 689. Because the facts here tend to show that competitors and market prices were directly affected, *Morgan* may be said to stand for the proposition that the rule of reason should not be applied to this case.

6. The defendants also claim that they are immune from antitrust liability as theirs is a regulated industry. Specifically, defendants argue that insofar as the Exchange is vested with self-regulatory powers, its approval of the differentials protects both it and the odd-lot defendants from anti-trust scrutiny. While Silver v. New York Stock Exchange, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963), which held that self-regulatory acts by the Exchange are exempt from antitrust laws only to the extent necessary to effectuate the purposes of the Exchange Act, might be read to refute this claim without more, defendants strike two separately stated arguments off the *Silver* analysis. First, they urge that because the effect of self-regulatory acts must be investigated to ascertain whether they are necessary to fulfill the commands of the Act, it follows that the *per se* rule cannot be applied at all. This view, as defendants see it, is supported by Kaplan v. Lehman Bros., 250 F.Supp. 562 (N.D.Ill., 1966), aff'd 371 F.2d 409 (7th Cir.), cert. den. 389 U.S. 954, 88 S.Ct. 320, 19 L.Ed.2d 365 (1967). Second, it is urged that the violation here complained of, the fixing of odd-lot differentials, is mandated by and necessary to implement the Act.

■ In my view, these two arguments are logically one—and the latter statement of that one argument is the better

articulation. In other words, the question of whether or not the *per se* rule is applicable, see discussion *supra,* is a separate question from that of whether or not the Exchange's regulatory approval of fixed differentials was within the purview of the Act and necessary to its implementation. On the other hand, if defendants are correct that fixing of the differentials with Exchange approval was proper and necessary to implement the Act, they presumably would have a complete defense to this action. For reasons to be hereinafter summarized, it is doubtful that such a defense can be sustained. Certainly, regulation of odd-lot differentials is within the scope of, mandated by and necessary to the implementation of the purposes and intent of the Act. See 15 U.S.C. §§ 78k and 78s. Further, if the Exchange had exercised its self-regulatory powers by establishing rules in respect to odd-lot differentials, I would assume *arguendo* that review of such rules might be beyond the powers of this court. But the Exchange, by its own admission, failed to establish any rules or regulations with regard to odd-lot differentials. To put the matter bluntly, it is unlikely that this failure or "benign acquiescence" can be considered to constitute regulation mandated by the Act. Even if it could be so considered, such "regulation" scarcely would be immunized from judicial review. To illustrate, defendants may have failed to consider that when the Exchange exercises its self-regulatory powers, it owes at least its members, if not others, certain procedural safeguards such as notice and the opportunity to be heard. In its "regulation" of odd-lot differentials, the Exchange provided notice to no one and afforded only the odd-lot defendants an opportunity to be heard. Therefore, plaintiff and the class have a powerful claim that " . . . the Exchange has plainly exceeded the scope of its authority under the Securities Exchange Act to engage in self-regulation and therefore has not even reached the threshold

of justification under that statute for what would otherwise be an antitrust violation." *Silver, supra,* 373 U.S. at 365, 83 S.Ct. at 1261.

7. Defendants next argue that the Commission's approval rendered the differentials the "legal" rate and that thus they cannot be held liable, even though that rate was initially fixed in violation of the antitrust laws. Keogh v. Chicago & Northwestern Railroad Co., 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183 (1922). It is at least questionable whether the Commission, while doubting its jurisdiction to do so, could grant administrative approval in the sense to which *Keogh* refers. This argument need not be reached, however, since *Keogh* and its progeny are to be applied only " . . . in cases of plain repugnancy between the antitrust and regulatory provisions." United States v. Philadelphia Nat. Bank, 374 U.S. 321, 351, 83 S.Ct. 1715, 1735, 10 L.Ed.2d 915 (1963). Insofar as *Silver, supra,* has made it clear that a "plain repugnancy" does not exist between the Act and the antitrust laws, the *Keogh* doctrine is of no applicability here.

 8. Finally, defendants claim that plaintiff and the class are barred from seeking damages since they failed to complain of the differentials to the Commission under the provisions of the Administrative Procedure Act, 5 U.S.C. § 551 et seq. While this argument might have some force if that agency could provide the relief here sought, the Commission is clearly powerless to do so. Although the Commission can consider antitrust matters, as can any other regulatory agency, see The Rules of the New York Stock Exchange, 10 S.E.C. 270 (1941), it does not have primary jurisdiction thereof. Thill Securities Corp. v. New York Stock Exchange, 433 F.2d 264, 272 (7th Cir., 1970). Furthermore, the Exchange, which could not be an "aggrieved person", has no standing to commence antitrust suits, see Hawaii v. Standard Oil of California, 405 U.S. 251,

92 S.Ct. 885, 31 L.Ed.2d 184 (1972), and, of course, could not entertain a class suit or award damages. Indeed, the Commission has done all that it could do by requiring the Exchange to establish the Rule which lowered the differential in 1966. To now bar plaintiff from seeking recovery of damages incurred prior to 1966 would be unjust and would needlessly sacrifice " . . . the benefits of competition acknowledged by Congress." United States v. Third National Bank in Nashville, 390 U.S. 171, 189, 88 S.Ct. 882, 893, 19 L.Ed.2d 1015 (1968).

9. Concerning plaintiff's claim against the Exchange for failure to regulate, the Exchange may well be liable to plaintiff and the class for a violation of its statutory duty to regulate its members, provided that (1) damage can be shown, Baird v. Franklin, 141 F.2d 238 (2d Cir.) cert. den. 323 U.S. 737, 65 S.Ct. 38, 89 L.Ed. 591 (1944), and (2) there is proof that the Exchange either knew or had reason to know that its rules were being violated. Pettit v. American Stock Exchange, 217 F.Supp. 21, 29–30 (S.D.N.Y., 1963). It has recently been held that the Exchange may also be civilly liable for a failure to regulate its membership under a third party beneficiary theory. Weinberger v. New York Stock Exchange, 335 F.Supp. 139, 144 (S.D.N.Y., 1971).

Defendant Exchange acknowledges these cases but asserts that they are distinguishable as they all concern the failure of the Exchange to adhere to its own rules and not the failure to create rules. This is likely to be a distinction without a difference. Moreover, the argument ignores the fact that the duty to regulate springs from the Act and not from any rule the Exchange might adopt thereunder. At the very least, the Exchange is under a " . . .

twofold duty . . . of enacting certain rules and regulations and of seeing that they are enforced." Baird v. Franklin, *supra,* 141 F.2d at 244.

Plaintiff has excellent evidence that the Exchange has not satisfied either of these duties. As has been repeatedly stated herein, no rules concerning odd-lot differentials were enacted or approved by the Exchange, notwithstanding the rather plain requirements of Sections 6 and 19 of the Act. 15 U.S.C. § 78f and § 78s. The "practices" which the Exchange claims satisfied its duties with regard to the differentials could be interpreted as no more than complicity in the price fixing schemes of the odd-lot defendants or an example of the Exchange's " . . . inability or unwillingness to curb abuses . . . " *Silver, supra* 373 U.S. at 351, 83 S.Ct. at 1254. In sum, plaintiff and the class have a strong case that the Exchange acquiesced to increased differentials with at least constructive knowledge that resulting increased cost to the investing public would benefit only a select few of its members—i. e. that the Exchange condoned one of the very abuses which the Act was passed to curb.

## ALLOCATION OF COST OF NOTICE

On the basis of the foregoing, it appears that plaintiff and the class he represents are more than likely to prevail at trial or upon a motion for summary judgment. Rule 56, F.R.Civ.P. I conclude, therefore, that defendants should bear 90% of the costs of Rule 23(c) (2), F.R.Civ.P. notice to the class. Of defendants' share, one-half should be borne by the Exchange and one-half by the odd-lot defendants. The remaining 10%, which represents the "hazards of litigation", must be put up by plaintiff.

It is so ordered.