**Mildred DOLGOW et al., Plaintiffs,**

v.

**Dillon ANDERSON et al., Defendants.**

**No. 66 Civ. 1057.**

United States District Court, E. D. New York.

Oct. 21, 1971.

Avrom S. Fischer, Brooklyn, N. Y., for plaintiffs.

Shearman & Sterling, New York City, for defendant Monsanto Co.; John A. Wilson, Michael J. DeSantis, Lawrence G. Golde, New York City, of counsel.

Sullivan & Cromwell, New York City, for individual defendants; David W. Peck, Roy H. Steyer, James W. Bowers, New York City, of counsel.

John L. Davidson, Jr., St. Louis, Mo., for defendant Mercantile Trust Company National Association, as Executor.

## MEMORANDUM AND ORDER

WEINSTEIN, District Judge.

This is an action brought by stockholders for damages against a corporation and its principal officers and directors who allegedly manipulated stock prices to their own advantage by misleading investors. Prior procedural incidents have already been described. *See, e. g., Dolgow v. Anderson*, 438 F.2d 825 (2d Cir. 1970); 43 F.R.D. 21 (E.D. N.Y.1967); 43 F.R.D. 472 (E.D.N.Y. 1968); 45 F.R.D. 470 (E.D.N.Y.1968); 53 F.R.D. 661 (E.D.N.Y.1971).

### I.

Plaintiffs' and defendants' present motions test the propriety of continuing this litigation as a class action. In its opinion of September 1970, the United States Court of Appeals reversed the order of this court determining that the litigation should not proceed as a class

action and remanded the matter for further consideration. Dolgow v. Anderson, 438 F.2d 825 (2d Cir. 1970). Having reconsidered the matter in accordance with the opinion of the Court of Appeals, this court concludes that the action is not properly denominated a class action.

## II.

The Court of Appeals was, apparently, under the misapprehension that disallowance of the class action aspect of the case was predicated on this court's grant of defendants' motion for summary judgment. It wrote:

> "Since the lower court's order disallowing the maintenance of the action as a class action was premised on the grant to defendants of summary judgment, that order is . . . reversed." Dolgow v. Anderson, 438 F.2d 825, 830 (2d Cir. 1970).

In point of fact, the two issues were treated by this court quite distinctly. From the outset it was made clear to the plaintiffs that the standard required for going forward as class representatives was higher, under the circumstances of this case, than that required to withstand a motion for summary judgment. Dolgow v. Anderson, 43 F.R.D. 472, 501–503 (E.D.N.Y.1968). The class action test applied was "a substantial possibility that they will prevail on the merits." *Id.* at 501. The test for summary judgment, as stated by the Court of Appeals in *Dolgow* was, apparently, whether the "issues are indeed sham." Dolgow v. Anderson, 438 F.2d 825, 833 (2d Cir. 1971) (on petition for rehearing). The reason for the distinction between not allowing the litigation to go forward at all and allowing it to go forward but only in individual capacities has been summarized as a:

> "notion that a preliminary 'merits' hearing is appropriate to determine whether a claim is sufficiently meritorious to warrant judicial sanction of a potentially time-consuming class

action." Dole, Jr., The Settlement of Class Actions for Damages, 71 Colum. L.Rev. 971, 1006 (1971).

In the instant case the trial court determined that the stricter summary judgment test had been met by defendants. *A fortiori*, the less strict standard for denying a class action had been satisfied. Reversing such reasoning is not possible. By determining that summary judgment did not lie the Court of Appeals did not automatically decide that enough had been shown to warrant permitting this action to proceed as a class action unless it was deciding that there was no difference between the two tests. If it were implicitly deciding that—*i.e.*, the class action procedure applied by the trial court was improper—it would undoubtedly have said so. Until informed to the contrary by an appellate court, this court must apply the class action test set forth in 43 F.R.D. at 501 as the law of the case. Even were we to consider the matter anew we would arrive at the same result.

As the Second Circuit has informed us, the trial court is obliged to consider whether a class action is a fair and efficient method of deciding a legal controversy. It wrote:

> "in many ways, the most important requirement to be met before * * * litigation can be allowed to proceed under Rule 23(b) (3) is that the class action device must be superior to other methods available for a fair and efficient adjudication of the controversy." Green v. Wolf Corp., 406 F.2d 291, 301 (2d Cir. 1968).

In making this determination, two considerations favor a liberal construction of Rule 23; first, the class action should be favored "at least at the early stages of the litigation." *Id.* As the Tenth Circuit suggests:

> "if there is to be an error made, let it be in favor and not against the maintenance of the class action, *for it is always subject to modification should later developments * * *

*require."* Esplin v. Hirschi, 402 F.2d 94, 99 (10th Cir. 1968) (emphasis supplied).

Second, the class action is a superior device where many persons have been harmed, but "not one of them seems to have been injured seriously enough to motivate the initiation of a solely individual action." Green v. Wolf, *supra,* 406 F.2d at 301.

Neither condition exists in this case. The class action is now denied following a lengthy hearing, at which both sides had ample opportunity to present evidence and cross-examine witnesses, after which the court concluded that the possibility of recovery on the merits was so slight as not to justify the enormous expense and inconvenience of trying this case as a class action. Individually named plaintiffs seek sufficient actual and punitive damages to satisfy the court that denial of a class action at this stage will not block their efforts to seek recovery.

The propriety of holding a preliminary hearing on the merits in determining whether a class action is the superior method fairly and efficiently to adjudicate a complex case has been discussed and approved elsewhere, although no appellate court has apparently yet addressed itself to the matter. *See,* Dolgow v. Anderson, 43 F.R.D. 472, 501 (E.D.N.Y.1968); Milberg v. Western Pacific Railroad Co., 51 F.R.D. 280 (S.D.N.Y.1970), appeal dismissed, 443 F.2d 1301 (2d Cir. 1971); Wechsler v. Tenna Corp., CCH Fed.Sec.L.Rep. ¶ 92, 923 (S.D.N.Y.1971). *Cf.* Philadelphia Electric Co. v. Anaconda American Brass Co., 43 F.R.D. 452, 458 (E.D.Pa.1968). *See,* also, 40 U.Colo.L.Rev. 462 (1968); 5 Ga.St.B.J. 278 (1968).

One judge in this circuit has criticized this approach as having "the effect of modifying the current law on summary judgment in cases where the only possible method for plaintiffs to proceed is by class action". Fogel v. Wolfgang, 47 F.R.D. 213, 215, n. 4 (S.

D.N.Y.1969). This countervailing argument is inapplicable where the individual claim is, as here, substantial. Significantly, the same district judge who decided *Fogel* is not opposed to using a preliminary hearing on the merits as a device for ascertaining which party should carry the heavy burden of notifying the class. Eisen v. Carlisle & Jacquelin, 52 F.R.D. 253, 270–272 (S.D.N.Y. 1971). Were an *Eisen* hearing to result in a decision adverse to the plaintiff, the practical effect in many cases would be that the class proceeding could not go forward because of the huge outlay of cash that might be involved—a result reached more directly by the procedure used here. *Cf.* Homburger, State Class Actions and the Federal Rule, 71 Colum. L.Rev. 609, 652 (1971) (suggesting a rule avoiding the need for a merits hearing by permitting the court to dispense with notice).

### III.

In postponing a determination of the class action motions in January of 1968, this court made it clear to the parties that it would provide full opportunity to utilize discovery procedures and that it would require a showing by plaintiffs of more than mere suspicion and surmise. Accordingly, a decision on the class action motions was delayed "pending a preliminary hearing . . . with respect to the possibility of plaintiffs' prevailing on the merits." Dolgow v. Anderson, 43 F.R.D. 472, 478 (E.D.N.Y. 1968). The court pointed out that at the preliminary hearing:

"* * * plaintiffs will be required to show that statements emanating from the defendants relating to Monsanto's future prospects during the period in question were consistently over-optimistic—that is, that a consistent course of misconduct was involved. If, for example, it develops that while some individual defendants were making intermittent unwarranted optimistic appraisals, the company's annual reports were portraying

the company's future prospects in more realistic terms, the class allegations will be stricken or the class broken up into one or more drastically narrowed subclasses encompassing only those purchasers who acquired their shares immediately after issuance of a series of false statements. * * * It will not do for plaintiffs to show a few isolated examples of 'seller's puff.'

\* \* \* \* \* \*

"A case such as the present one should not be allowed to proceed as a class action unless the plaintiffs are able to convince the Court that there is a substantial possibility that they will prevail on the merits.", 43 F.R.D. at 489–490, 501.

A full hearing, after extensive discovery, was held in December of 1968 with all parties introducing such evidence as they saw fit.

### IV.

The court then concluded that a class action was inappropriate. The reasons for the decision were, briefly:

1. The named plaintiffs have a substantial stake in the litigation. Having observed their conduct carefully in extensive proceedings the court now concludes that there is good reason to believe that they will be in a position to prosecute it whether or not it goes forward on behalf of the class. Isaacson alone seeks damages of $14,076. In addition, all named plaintiffs request return of consideration and substantial punitive damages. (We need not now decide whether the decision would be the same were our conclusion different on this issue of the amount at stake.)

2. If the action proceeds as a class action at this advanced stage after discovery has been completed and shortly before a trial by jury, members of the class will need to be notified so that they can take appropriate action to protect their interests or withdraw. *See*, Fed. R.Civ.P. 23(c) (1), (d) (2) (class action status to be determined as "soon as prac-

ticable" after action commenced; notice to class members). Notice will result in substantial expense to the litigants since the class members may number in the tens of thousands. Even were the plaintiffs required to assume the bulk of this cost, the defendants will necessarily be put to considerable trouble in supplying various lists and in cooperating in publication. No matter how the notice is phrased, some imputation of wrong-doing by defendants cannot be avoided. These costs must be weighed against the possibility of success. The equities favor the defendants where the probability of success is remote even when—a matter we do not now decide— a motion for summary judgment does not lie because there are, arguably, issues of fact.

3. There is no substantial possibility that plaintiffs will succeed on the merits. Following the decision of the Court of Appeals remanding the case for findings of fact the parties were granted all of the time they requested to furnish proposed findings. Of plaintiffs' proposed findings only 25–28 bear on the critical issues. They read as follows:

"25—*The pattern* of the defendants' sales and the exercising of options that had several years to run, *compels the inference that the defendants were pessimistic* about Monsanto's future prospects at a time when the defendants were publicly professing to be optimistic about the company's prospects.

"26—*Plaintiffs have established that there was a suspicious or unusual pattern* of securities transactions by the individual defendants during the period in question in light of the public professions of optimism concerning Monsanto's future prospects.

"27—The internal data of Monsanto did not justify the issuance of forecasts of substantial earnings gains by Monsanto to the public.

"28—On the basis of the information before them, the estimates by

the individual defendants that were issued to the public were unreasonable and unrealistic." (Emphasis supplied).

As is indicated more fully in the findings set out in Part V, *infra*, there is no credible evidence that "the defendants were pessimistic about Monsanto's future prospects" (Plaintiffs' Findings 25). There was no "suspicious or unusual pattern of securities transactions by the individual defendants" that was not fully explained as innocent (Plaintiffs' Findings 26). Moreover, at this stage a mere "suspicious . . . pattern" will hardly suffice to burden defendants with a class action.

It is not true that the "internal data of Monsanto did not justify the issuance of forecasts of substantial earnings gains" (Plaintiffs' Findings 27). The information available to defendants as shown by the material submitted to the court and available through extensive discovery indicates that those forecasts were sound when made and that the subsequent failure of earnings to meet predictions was due to market and other changes that a reasonable businessman would not have foreseen or would have discounted in making predictions.

There has been a conclusive demonstration refuting the claim that "estimates by the individual defendants that were issued to the public were unreasonable and unrealistic" (Plaintiffs' Findings 28). Based on information then available and their responsibility to the corporation, the estimates that they made were reasonable and sound and well within the realm of normal business judgment. The only evidence which could possibly—and that requires an unreasonable stretching of the record in plaintiffs' favor—support plaintiffs' position was the statements of defendant Lucas on a few occasions when his public estimates were more optimistic than those of other defendants. There is no showing and no hint of any evidence that any other defendants conspired to induce

Mr. Lucas to make favorable estimates. In short, there is no "substantial possibility" that plaintiffs will prevail on the merits.

■ The affidavit and testimony of Professor Robbins furnished by plaintiffs after the remand—more than a year and a half after all evidence was to be presented to the court—is rejected as improperly submitted on the class action issue. There is not the slightest excuse for this delay. It has unnecessarily burdened both the court and defendants.

Even were this material to be considered it would not affect the court's decision. As Professor Robbins admitted, all that his examination of the case suggested was a "suspicion" of wrongdoing warranting investigation. His testimony in part was as follows:

"Q In other words, what it boils down to is that you are in a state of curiosity and wonderment about what did take place, but you don't have any knowledge of what took place?

A Exactly." (Record on post-remand hearing, 283).

. . . . .

"THE COURT (Continuing):
Looked at from an outsider's point of view, somebody who understands security analysis, there are circumstances here that should alert the analyst to very suspicious conditions and he ought to investigate further to find out whether there are discrepancies between what these men believe and what they are saying, and whether they are selling in order to reap a profit before there is a fall . . .
Is that it?

THE WITNESS: That's right."
(Record on post-remand hearing, 430).

. . . . .

THE WITNESS: "If I have to summarize these things, I'd say, your Honor, you look at this—at what happened with respect to the operations as a general practice, you get suspicious.

That's all I can say and all I want to say here.

All right. Now there are three thing I am concerned about when I am suspicious: How about these forecasts of earnings?

I have a little suspicion.

Second thing I am concerned about is reporting of quarterly statements during this period.

"I just indicated to you what my somewhat concern is, and the third thing, is, which we discussed—and its purely a matter of judgment—is that Monsanto during this period, when it was aware of these problems we were talking about, was it making adequate disclosure?

These are the three areas of concern that I would say stemming from this general principal.

That's really what my story is. That's all."

(Record on post-remand hearing, 437–438).

Had this witness, or any other competent expert, been consulted by plaintiffs at the outset of the case instead of at its end, they might possibly have focused their pleadings, discovery and motion practice in a way that would have saved considerable effort and expense to all concerned. But the time for such exploration is past. Even in so merits oriented a procedural system as ours, there must be a time for decision. The suspicions of the plaintiffs' experts have been fully explored and have been found to be without substantial foundation. This is indicated by the findings of fact, a matter to which we now turn.

## V.

## FINDINGS OF FACT

The Court of Appeals remanded for the "preparation of findings and conclusions" on the motion for summary judgment. Dolgow v. Anderson, 438 F. 2d 825, 833 (2d Cir. 1971) (on petition for rehearing). While no findings are required when a motion to deny maintenance of an action as a class action is granted (Dolgow v. Anderson, 438 F.2d 825, 829 (2d Cir. 1971); Fed.R.Civ.P. 52 (a) ), this court now believes it useful to expand in writing on its prior oral findings. As recently indicated in Interpace v. City of Philadelphia, 438 F. 2d 401, 404 (3d Cir. 1971):

"Although the district court is not required to make findings in deciding a motion of the type here involved, we do think that where, as here, the district court is presented with conflicting positions of substance as to how it should exercise its discretion in determining whether to permit a class action, it is a salutary practice to give the litigants, either orally or in writing, at least a minimum articulation of the reasons for its decision. This is particularly true because of the practical importance of such a determination and the limited possibility of obtaining a seasonable review of the determination."

The findings of fact are as follows:

A. *Description of the Parties*

*Plaintiffs*

1. At the commencement of this action, plaintiffs Mildred and Benjamin Dolgow owned 23 shares of Monsanto stock as joint tenants and plaintiff Sarah Fischer owned 72 shares. The Dolgows and Mrs. Fischer had each purchased fractional interests to round out single shares in December 1964 and in December 1965, in connection with the 2% stock dividends declared by Monsanto at year-end in 1964 and 1965.

2. Plaintiff Reuben Isaacson is said to have purchased 300 shares of Monsanto stock on April 9, 1965 and to have sold them, together with six additional shares acquired as a stock dividend on October 5, 1966.

*Defendants*

3. Monsanto is a major diversified producer of chemical and related products. Its securities are widely held; it has about one hundred thousand shareholders and more than thirty million shares outstanding. Monsanto's stock is traded on the New York Stock Exchange. Monsanto operates plants in forty or more states of the United States, as well as in the United Kingdom, Europe, Japan and Australia. Monsanto's principal product lines are chemical fibers, which in 1965 accounted for nearly 30% of its sales; plastics, resins and coatings, which in 1965 accounted for approximately 25% of sales; and various other products, including phosphates and detergents, agricultural chemicals, plasticizers, oil and textile chemicals. In 1965, Monsanto had eight operating divisions, *e.g.*, Agricultural Division, Chemstrand Division, each of which was headed by a General Manager.

4. The individual defendants all hold or held important positions of responsibility at Monsanto. At the time this action was instituted in November, 1966, all had been employed by Monsanto for a number of years and several had been employed for more than twenty-five years, before the alleged commencement, about the fall of 1964, of the alleged "conspiracy" charged in the second amended complaint.

5. The fifteen individual defendants are:

Edward A. O'Neal, Chairman of Monsanto from March, 1965 to July, 1968 (now retired as Chairman but still a member of its Board);

Charles H. Sommer, President and Chief Executive Officer from 1960 to July, 1968 (now Monsanto's Chairman);

Edgar M. Queeny, the son of Monsanto's founder, and a former Chairman and President of Monsanto (now deceased and for whom his Executor has been substituted);

Eleven Vice Presidents of Monsanto at the time of suit, including

Four Vice Presidents who were also members of the Board of Directors and of the Executive Committee: Edward J. Bock, John L. Christian (now deceased and for whom his Executor has been substituted), John L. Gillis and Robert K. Mueller;

Three Vice Presidents who were General Managers of Operating Divisions: H. Harold Bible (Hydrocarbons & Polymers Division), John R. Eck (Inorganic Chemicals Division) and Robert R. Rumer (Agricultural Division);

Four other Vice Presidents: Edwin J. Putzell, Jr., who was Secretary and General Counsel, Arthur W. Lucas, who was in charge of Central Planning, Evaluation and New Ventures, Patrick J. Dowd, who was Treasurer, and J. Russell Wilson, who was Director of the Patent Department; and

Earl J. Wipfler, at the time of suit Controller and Director of Monsanto's Accounting Department.

6. Six other directors of Monsanto were named in the second amended complaint as defendants but none was served or made a party to the action. Five of them, Dillon Anderson, David R. Calhoun, Frederick M. Eaton, Herbert Hoover, Jr. and Alan H. Temple (who had retired in September, 1966, two months before the commencement of the action) were "outside" directors who had served on the Board since prior to 1964. The sixth is Dr. Charles Allen Thomas, a former Chairman and President of Monsanto, who retired as Chairman in March, 1965 (when he was succeeded by Mr. O'Neal) but remained as a director

and Chairman of the Finance Committee and Technical Committee. Together with the seven individual defendants who were directors, these individuals (apart from Mr. Temple, retired) constituted all but two of the directors of Monsanto at the time of suit in November 1966. The two directors not named in the complaints had been elected to the Board in July and November, 1966, respectively.

B. *Monsanto's Results, Prospects, Developments and Problems, 1964–1966*

7. Monsanto's net sales and net income for the four-year period 1961–1964 had grown rapidly and the year 1964 was a record year. In 1964, Monsanto had net sales of $1,358.7 million and net earnings of $114.9 million ($3.72 per share).

8. At the end of 1964, Monsanto's projections indicated that 1965 results would surpass 1964 results.

9. Results of operations for both the first quarter and the second quarter of 1965, as well as the first six months as a whole, set new records in sales and earnings, and at the end of the first half of 1965, Monsanto projected increased sales and earnings for the year as a whole. Sales and income in the third quarter of 1965 were higher than in the corresponding quarter of 1964 (exceeding those of any other prior third quarter) and at that time Monsanto projected record sales and earnings for the year 1965.

10. During the fourth quarter of 1965, Monsanto experienced some temporary difficulties in starting up plants using new processes. Despite technical problems, Monsanto's net sales and net income both set all-time highs in 1965, with sales rising to $1,468 million and net income rising to $123 million ($3.89 per share).

11. At the end of 1965, Monsanto anticipated that the results of operations. in 1966 would increase over 1965's record results.

12. In the first half of 1966 net sales and income of Monsanto did continue to increase, and set new records for any six-month period. Monsanto at that time estimated that overall 1966 results would exceed those of 1965.

13. During the second half of 1966, the chemical industry, and particularly large synthetic fiber producers such as Monsanto and DuPont, was especially hard hit in a general business and stock market recession. Synthetic producers experienced a number of severe and unanticipated setbacks resulting from, among other things: the austerity program introduced in July in Great Britain, which curtailed consumer spending; sharp reductions in the prices of nylon and polyester; and a fall-off in the consumption of acrylic fibers in the United States caused by the lack of housing starts and tight money. These difficulties resulted in unexpected cut-backs in demand for Monsanto products both in the United States and abroad, and affected the start-up of new facilities, which Monsanto was undertaking both in the United States and in Europe.

14. As a result of these unanticipated difficulties, although Monsanto's 1966 net sales increased by some 10% over 1965's net sales, its income for the year declined to $112.3 million.

C. *Comparable Decline of DuPont and the Stock Market in 1966*

15. Early in the year 1966, and continuing through July 1966, DuPont was optimistic that its sales in 1966 would increase between 8 and 9 percent over 1965's results and that its earnings likewise would advance by 4 or 5 percent over 1965. However, DuPont suffered a decline in net income from operations during the third and fourth quarters of 1966, and its net income for 1966 was less than that of 1965. The primary reason for this unanticipated decline, as with Monsanto, was a significant fall-off in results of synthetic fiber operations in the last half of 1966.

16. During 1966 market prices of securities generally declined. The Dow

Jones Industrial average, which was 955.15 on February 9, 1966, dropped some 250 points to 744.32 by October 7, 1966. The decline of securities prices in the chemical industry was even greater than the decline of the Industrial average and in the last half of 1966 the prices of Monsanto and DuPont securities declined even more than those of the overall chemical industry.

### D. *Monsanto's Public Reporting*

17. Monsanto had a broad program for advising its shareholders and the public at large of the results of past operations, of future prospects, and of current developments and problems.

18. This program included regular preparation and distribution of Monsanto's annual and quarterly reports; periodic distribution of press releases containing information regarding Monsanto; and presentations to and interviews with the press, members of the financial community and stockholders.

19. The Annual Reports included, among other operating and historical information, a report from the President and Chairman on overall company activities during the year; a comparative year-to-year breakdown, by quarter, of sales, income and per share earnings; a table setting forth changes in the year's per share earnings resulting from such items as reductions in earnings due to lower selling prices and higher start-up costs; a summary of highlights of operations of each of Monsanto's major product groups, including percentage of total sales represented by each product group; and other historical and comparative financial data.

20. Quarterly reports, entitled "First Quarter and Annual Meeting Report," "First-Half Report" and "Nine Months Report," were issued at the end of the first, second and third quarters of each year. They contained, among other information, an unaudited report of sales and earnings, as well as a statement of consolidated financial position, as of the end of the quarter. The annual meeting report issued with the first quarter report included remarks of Monsanto's Chairman and President at the annual meeting of shareholders.

21. Officials of Monsanto also periodically made presentations to and had interviews with financial analysts, members of the press and shareholders to report on the current situation at Monsanto and to indicate prospects for the future. Mr. Sommer, whose responsibilities as President included world-wide public relations for Monsanto, was assisted in this task by Mr. Lucas, who had direct responsibility for financial reporting and analysis. Periodically, he reviewed his presentations with Mr. Sommer.

22. During the fourth quarter of 1965, when Monsanto experienced some temporary plant difficulties, Mr. Lucas reported these difficulties in public statements which appeared in the Wall Street Journal of November 15, 1965 and the Daily News Record of November 11, 1965.

23. During the latter half of 1966, particularly during the final quarter of the year, when both Monsanto and the fiber industry were experiencing severe and unanticipated setbacks, there were numerous public statements reporting these difficulties, including articles in the Wall Street Journal of October 5, 1966, Chemical and Engineering News of October 31, 1966 ("Carpet Market Sags for Acrylic Fibers"), Monsanto's 1966 Nine-Month Report; and in Business Week of October 29, 1966 ("Too Many Fibers Spoil the Market").

24. Monsanto's policy was to make its public reporting as informative as possible, to be as fair as possible in telling its stockholders and the public, including the financial community, what Monsanto expected regarding its operations without disclosing confidential information regarding details of interest to competitors rather than investors.

25. Monsanto's program of public reporting was appropriately formulated to inform its stockholders, the financial community and the public generally, in a fair, timely and current manner, of Monsanto's results, prospects, and current developments and problems, including changes in prospects and problems.

26. Monsanto's public statements were based upon Monsanto's internal documents reflecting its results and estimates of its future prospects.

E. *Preparation of Monsanto's Principal Internal Documents Reflecting Results and Estimates*

27. The principal internal documents that provided management with the factual information upon which to base operational and financial decisions, and that were the basis for the public statements were the "Corporate Long-Range Plans," the yearly "Budgets," the quarterly "Budget Reviews," and the various "Capital Appropriation Requests," described below. At the end of each month, there was also prepared a monthly financial results report for the Board of Directors and Executive Committee.

*The Corporate Long-Range Plan*

28. The "Corporate Long-Range Plan," which covered a period of five years, and was revised annually, represented a consolidation of individual five-year plans by each of Monsanto's Divisions. Preparation of these Division plans involved determinations by the General Manager of the Division and his staff in the Marketing, Purchasing, Personnel, Treasury and Engineering Departments of the Division, as well as consultations with outside experts. The Division plans were each reviewed by top corporate officers prior to their consolidation by the financial planning staff into the Corporate Long-Range Plan, which was also reviewed by top officers prior to presentation to the Board of Directors.

29. Corporate Long-Range Plans were the product of many people, starting from "front-line salesmen" and were ultimately presented to the Board of Directors so that its members' judgments could be incorporated into future company plans.

*The Budgets and Budget Reviews*

30. At the end of each year, each Division of Monsanto prepared a budget for the next year indicating, among numerous other operating data, budgeted sales and earnings of the Division. Work on the budgets began in August or September and was completed in December. After the initial Division budget was prepared, it was reviewed by the Division Budget Committee, the Division Operating Committee and then the Corporate Budget Committee. Thereafter, the budgets of the individual Divisions were consolidated into an over-all Corporate Budget, which was then reviewed by the Corporate Budget Committee and, finally, presented to the Monsanto Board of Directors as the "Approved Corporate Budget" for the next ensuing year.

31. The preparation of the Budget involved the work and judgment of many people from every department of each Division with regard to raw cost and price data; Marketing made an estimate of pounds and price determined primarily from discussions with customers; Manufacturing calculated how much it would cost to make these products; and Accounting assessed overhead, research and other charges.

32. A quarterly "Budget Review" was regularly prepared at the end of the first and second quarters of each year but not the other quarters because of duplication with the procedures for the budget itself. The budget reviews included forecasts of sales and earnings, as of that time, by each Division, as well as for Monsanto on an over-all basis, for the balance of the year.

*Capital Appropriation Requests*

33. During the three-year period 1964–1966 Monsanto made capital outlays

**676**

of over $700 million for plant and equipment. Each sizable capital project was described in an "Appropriate Request" which set forth the capital requirement need, the anticipated return on investment and the payout period. Each appropriation request was reviewed with, and approved by, the Corporate Executive Committee and also by Monsanto's Board of Directors. Preparation of an Appropriation Request involved estimates by Engineering, Treasury, Accounting and other groups within the Division of such factors as costs, time of completion, technical innovations and developments required, and overheads required to handle the new production. These figures were reviewed by the Division Operating Committee before presentation to the Executive Committee and the Board, to be sure that projected prices, capacities and costs were accurate.

*Summary as to Internal Documents*

34. Monsanto's internal documents, including its Long Range Plans, Budgets, Budget Reviews and Capital Appropriation Requests, were appropriately prepared and extensively reviewed, at all levels of Monsanto for the purpose of fairly and realistically reflecting Monsanto's results and informed estimates of its future prospects.

35. Monsanto's management demanded that the internal documents and estimates be honest. The divisions made every effort to be accurate and honest in their forecast. The internal estimates were made honestly, were reasonable, and were the best estimates of the people in Monsanto most qualified to make them.

36. The widespread participation by staff members at all levels of Monsanto in the preparation and review of these internal documents, as well as the participation by persons at the top level who are not defendants, confirm the conclusion that the estimates shown in these documents fairly reflected information on raw cost, product sales, and price and other data available to Monsanto.

**F. *Plaintiffs' Analysis and Defendants' Answers***

37. In support of their case, plaintiffs filed an "Analysis of the Publicly Reported Statements of the Defendants" containing 37 separate "items." These items consist for the most part of excerpts from newspaper articles and trade publications, over the period December 1, 1964 through January 26, 1967, reporting statements by Monsanto spokesmen on past results, current developments and problems, and anticipated prospects. Plaintiffs assert that the excerpts referred to by them were made pursuant to the alleged conspiracy to inflate the price of Monsanto stock, and plaintiffs' counsel stated that the Analysis, alone, substantially supported plaintiffs' contentions.

38. Of the 37 items complained of in plaintiffs' Analysis: four refer to statements by defendant O'Neal (Nos. 13, 15, 24, 29); nine refer to statements by defendant Sommer (Nos. 7, 8, 14, 16, 22, 23, 25, 30, 36); eighteen refer to statements by defendant Lucas (Nos. 3-6, 9, 17-21, 26-28, 31-35); two refer to statements by non-defendant employees of Monsanto, one of whom, Mr. Smith, testified at the evidentiary hearing (Nos. 11, 12); and four refer to reports of independent brokerage houses and investment advisory letter services, not attributable to any Monsanto employee (Nos. 1, 2, 10, 37).

39. None of the allegedly false or misleading statements specified in plaintiffs' Analysis is attributed in any way to twelve of the fifteen individual defendants.

40. The defendants filed a separate "Defendants' Answer" to each of the items in plaintiffs' Analysis, each Answer containing a presentation of the contemporaneous supporting internal corporate material verifying the accuracy and propriety of every statement referred to by plaintiffs. In addition, each Answer set forth actual results and a discussion of the contemporaneous public

disclosure of current developments and problems. There were attached as exhibits to each Answer copies of the relevant portions of every document, internal and public, referred to in the text.

41. A brief analysis by categories, based upon the full documentation annexed to defendants' respective Answers, of each of the 33 items in plaintiffs' Analysis attributable to any of the defendants or other Monsanto personnel is set forth in the following subparagraphs (some items are referred to in more than one category):

(a) Twenty items (Nos. 3, 4, 5, 6, 8, 9, 14, 17, 18, 20, 21, 22, 27, 28, 29, 30, 31, 32, 34, and 36) refer to projections of anticipated gains of Monsanto for the years 1965 through 1967, in terms primarily of anticipated sales and earnings. Each of these projections at the time made was fully supported by Monsanto's internal estimates and current experience. Many of these estimates were completely fulfilled by actual results. In all other instances there was full and contemporaneous disclosure of supervening developments and estimates to Monsanto's shareholders and the public.

(b) Eleven items (Nos. 4, 5, 6, 11, 12, 14, 16, 17, 20, 26, and 34) refer to projected growth, anticipated results, and current developments and problems of Monsanto's Chemstrand Division. Each of the projections at the time made was fully supported by Monsanto's internal estimates and current experience. In the latter half of 1966, when there was an unanticipated downturn in Chemstrand's operations and prospects, as well as in the synthetic fiber industry generally, that downturn was fully and contemporaneously disclosed to Monsanto's shareholders and the public.

(c) Five items (Nos. 13, 15, 23, 33, and 35) refer to statements about Monsanto's overall anticipated growth. Each of these statements at the time made was fully supported by the past growth of Monsanto in the period 1960 to 1964, the capital expenditures program in the period 1964–1966, and other long-range projections of Monsanto's growth through 1970. To a substantial extent these projections were fulfilled, especially in terms of increased sales and assets, in the years 1965, 1966 and 1967.

(d) Five items (Nos. 7, 25, 26, 27, and 36) refer to statements concerning price trends and levels. Some relate to Monsanto's own prices (and others to the chemical industry generally). Each of the statements concerning Monsanto's prices was supported by internal projections and current experience. When, in 1966 and 1967, the selling prices of various of Monsanto's products continued to decline, the declines were fully and contemporaneously disclosed to Monsanto's shareholders and the public.

(e) Five items (Nos. 5, 6, 12, 16 and 24) refer to the increasing scope of Monsanto's foreign operations. Each of the statements at the time made was fully supported by Monsanto's internal projections and current experience. The expectations as to future growth in terms of sales volume were substantially achieved. That the gains were not as great as hoped for was fully and contemporaneously disclosed to Monsanto's shareholders and the public.

(f) Five items (Nos. 9, 19, 20, 27 and 33) refer to anticipated capital expenditures of Monsanto for the years 1965 and 1966.

Monsanto's internal projections of its capital outlays for plant and equipment were subject to continuing adjustment and revision throughout the course of those years, as in 1964. The plans for capital expenditures generally were adjusted upward throughout 1965 and downward throughout 1966.

Item 9 refers to a statement by Mr. Lucas, reported in Chemical Week of January 30, 1965, that Monsanto's capital expenditures in the year 1965 would be $260–275 million, which was less than but consistent with a January internal projection.

Item 19 refers to a comment by Mr. Lucas, as it appeared in the Milwaukee Journal of October 19, 1965, that anticipated 1966 capital expenditures would be "about the same" as those in 1965. At the time of the article, internal projections of 1966 capital expenditures were about 8% to 15% lower than the projected 1965 capital expenditures. Within a month thereafter Mr. Lucas was reported, in the Daily News Record of November 11, 1965 (Item 20) as saying that the digestion of the 1965 capital expansion program had been difficult and that 1966 capital expenditures "probably would run about $255 million". At that time the contemporaneous internal estimate was $254.6 million.

Item 27 refers to a statement by Mr. Lucas, reported in the Wall Street Journal of May 11, 1966, that Monsanto's capital expenditures in 1966 would be "down" from 1965's level and "would approach $250 million". At that time the contemporaneous internal estimate was $250.2 million. On August 30, 1966, Mr. Lucas was reported in the Daily News Record as having stated that the estimate of Monsanto's 1966 capital expenditures had been further revised downward to "about $210 million", which was less than but consistent with an August internal projection of $220 million and very close to the actual amount of capital expenditures ($211 million) that eventually were made in 1966.

Item 33 refers to a 13-page survey of the chemical industry which appeared in an article in Chemical Week of September 24, 1966. The survey contains the views of a number of chemical company executives regarding prospects for the six year period from 1966 through 1971. It states, without specific attribution to source, that Monsanto "expects to put about $235 million into a capital expansion program" in 1966. The $235 million figure was an early 1966 projection. By October 1966, Monsanto's capital expenditure estimate had been adjusted downward to $205 million. This figure was publicly reported in the St. Louis Post Dispatch of October 5, 1966, about 10 days after the Chemical Week article, which quoted Mr. Lucas as saying that "capital outlays for plant and equipment by Monsanto are scheduled to total about $205 million this year."

*Summary as to Statements Complained Of*

42. The statements and estimates complained of by plaintiffs which are attributable to any of the defendants or other Monsanto personnel were based upon Monsanto's carefully prepared and extensively reviewed internal documents, which fairly and accurately reflected Monsanto's results and best estimates of its future prospects.

43. The statements and estimates complained of by plaintiffs which are attributable to any of the defendants or other Monsanto personnel were consistent with, and fairly and accurately reflected, internal documents carefully prepared for budgetary, planning and review purposes and were based upon the best data available at the time of the statements.

44. The statements and estimates cited by plaintiffs in their Analysis which are attributable to any of the defendants or other Monsanto personnel either were fully borne out by actual results or there was full and contemporaneous disclosure of supervening developments and estimates to Monsanto's shareholders and the public.

45. The statements and estimates complained of by plaintiffs which are attributable to any of the defendants or other Monsanto personnel were intended to fulfill, and did fulfill, the proper objective of informing Monsanto's stockholders and the public of the results of operations and other matters of interest concerning Monsanto, and did not constitute an offer to sell or the use of a prospectus or bids for, or attempts to induce other persons to purchase Monsanto stock.

46. Monsanto's reporting to its stockholders, to the public and to the financial community was a fair and accurate reflection of the facts and the best estimates available to the Monsanto management. Moreover, Monsanto timely reported events which materially affected Monsanto's estimates and prospects and indicated the changes in Monsanto's estimates and prospects that could be expected.

47. None of the defendants, deliberately or otherwise, issued or omitted to issue information regarding Monsanto's results, prospects, developments or problems in order to mislead its stockholders or the public.

48. None of the defendants, deliberately or otherwise, issued misleading information.

49. The statements complained of by plaintiffs which are attributable to any of the defendants or other Monsanto personnel were not false or misleading and were not devices to inflate or manipulate, and did not inflate or manipulate, the market price of Monsanto stock.

50. Monsanto's results, prospects, developments and problems were fairly and timely reported to its stockholders and to the public.

G. *Reporting of the Investment Tax Credit, Start-up Costs, and the Disposition of Certain Real Estate*

51. The Revenue Act of 1962, as amended in 1964, 26 U.S.C. § 38, provided for an investment tax credit against federal income taxes equal to approximately seven percent of expenditures for machinery and equipment.

In each year's annual report from 1962 onward, Monsanto set forth the precise dollar amount of the credit for that year, as well as its effect on year-to-year comparisons of per share earnings. In addition, and specifically during the period 1964–1966, Monsanto referred to the effect of the credit in quarterly reports to shareholders and in press releases; Mr. Lucas publicly commented on the credit in

projections of 1965 earnings and in discussing prospects for 1966 and 1967 earnings.

52. Monsanto's accounting treatment of the investment tax credit was in accordance with the advice of its independent auditors and was consistent with standard and accepted accounting practice. Its reporting on this subject to its shareholders met all disclosure requirements of the Securities and Exchange Commission, the New York Stock Exchange and the accounting profession.

53. Monsanto adequately informed its shareholders and the public regarding the investment tax credit, including its effect on earnings.

54. During the period 1964–1966 Monsanto's investment tax credit was partially offset by start-up costs, which increased substantially over prior years. Monsanto informed its shareholders and the public regarding start-up costs in its annual reports—which, beginning in 1965, listed the effect of start-up costs on earnings in cents per share compared to the prior year—and in its quarterly reports as well as in Mr. Lucas' public statements.

55. In reporting to its shareholders and the public regarding start-up costs, Monsanto continually emphasized the relationship of start-up costs to earnings. For example:

In its 1965 First-Half Report, dated July 23, 1965, after noting the benefit to profits resulting from a reduced income tax rate and the increased investment tax credit, Monsanto, referred to its accelerated capital spending and high rate of plant completions and noted that the "completions, however, have been accompanied by increased start-up costs which, to a major extent, have offset the gain from the higher investment credit";

In its next Quarterly Report, the 1965 Nine Months Report, dated October 27, 1965, Monsanto again referred to its capital expenditures pro-

gram resulting "in materially higher costs in starting up plants" and pointed out that this had a significant effect on income;

In a press release of January 26, 1966 issued to announce Monsanto's preliminary results for 1965, Mr. O'Neal was quoted as pointing out that "an unusually large increase in the costs of starting up plants" was one of the principal factors nullifying the significant benefits of higher sales volumes and manufacturing economies;

Following the capital expenditures of some $295 million in 1965, Monsanto's 1965 Annual Report of February 21, 1966 stated that the "effect on earnings of the higher cost of starting up plants, especially some involving new technology, was so appreciable that it is listed separately for the first time";

And, at the annual meeting of shareholders on March 24, 1966, President Sommer's remarks included a discussion of increased start-up costs, which he described as "hurting" Monsanto in 1965 to the extent of 26 cents a share.

56. Monsanto pointed out in its reporting to the public the nature and magnitude of start-up problems and delays in new processes and facilities.

57. Monsanto adequately informed its shareholders and the public regarding start-up costs, including their effect on earnings.

58. In the first quarter of 1965 Monsanto, in connection with condemnation, realized a $2.3 million non-recurring, non-taxable gain on a sale of vacant land at Oxnard, California. Upon the recommendation of its auditors, Monsanto made two non-recurring charges to income in that quarter as an offset to this gain, namely: $1 million to a reserve for possible devaluation of foreign currencies; and $1.5 million to a reserve to provide self-insurance. As a result, there was no effect on earnings in the first quarter of 1965. Additionally the

comparative table at page 1 of Monsanto's 1965 Annual Report reported, under "Nonoperating items", an increase in earnings of seven cents per share resulting from "profit on sale of land" which, in terms of the number of shares outstanding, amounted to approximately $2.3 million. This fully reflected the nonoperating profit on the sale of the Oxnard property (there having been no profit on sale of land in 1964).

59. The accounting treatment of the offsetting gain and reserves was in conformity with generally accepted accounting principles, and these items were properly accounted for in reporting to Monsanto's stockholders and to the public. In the expert opinion of Mr. Neidig, further public disclosure of the tax treatment of the disposition of the Oxnard property would not have affected an evaluation of Monsanto's stock prices. As reasonable businessmen defendants were entitled to rely on this kind of expert advice which was available to them.

60. In 1965 Monsanto disposed of certain property known as the Hazelwood property, by transferring it to the Monsanto Trust, a charitable foundation which Monsanto had established. Monsanto thereby realized a tax saving of some $450,000 in a year when its taxes were over $79 million and its net income about $123 million.

61. The disposition of the Hazelwood property was pursuant to sound accounting advice, properly accounted for in Monsanto's reporting to its shareholders, and a benefit to the company. In the expert opinion of Mr. Neidig, knowledge of the tax treatment regarding the Hazelwood property would not have affected an evaluation of Monsanto's stock prices. As reasonable businessmen defendants were entitled to rely on the kind of expert advice which was available to them.

H. *The Purchases and Sales of Monsanto Stock by the Individual Defendants*

62. During the period 1964–1966, thirteen of the fifteen individual defend-

ants were engaged in regular and routine personal programs of increasing their holdings of Monsanto stock. These programs were effectuated through the exercise of stock options. A significant portion of the sales of Monsanto stock by the individual defendants during the period were made to finance these personal programs of increasing holdings of Monsanto stock.

63. Nine of these individual defendants—Bible, Bock, Christian, Eck, Mueller, O'Neal, Rumer, Sommer and Wipfler—exercised options at varying and unrelated times in the period September 1, 1964 to December 1966, in amounts varying from 400 to over 16,000 shares. (September 1, 1964 was the initial date for discovery purposes, the second amended complaint having alleged that the purported conspiracy commenced "about the fall of 1964".) Each increased his respective holdings of Monsanto stock in the course of the relatively short period involved in this litigation, from September 1964 to December 1966, as follows:

Mr. Bible increased his holdings from 2,648 shares to 8,907 shares;

Mr. Bock increased his holdings from 2,950 shares to 5,500 shares;

Mr. Christian increased his holdings from 9,771 shares to 14,708 shares;

Mr. Eck increased his holdings from 212 shares to 5,027 shares;

Mr. Mueller increased his holdings from 8,658 shares to 12,286 shares;

Mr. O'Neal increased his holdings from 13,151 shares to 14,558 shares;

Mr. Rumer increased his holdings from 692 shares to 1,044 shares;

Mr. Sommer increased his holdings from 12,716 shares to 21,295 shares; and

Mr. Wipfler increased his holdings from 1,854 shares to 2,196 shares.

64. The other four of these defendants—Messrs. Dowd, Gillis, Lucas and Putzell—had each exercised options between January 1964 and September 1964, in amounts varying from 3,266 to 10,000 shares, and sold some shares subsequent to September 1964 in connection with financing the earlier purchases. If purchases pursuant to options in 1964 prior to September 1, 1964 are taken into account, increases in shareholdings also appear for these defendants during the period 1964–1966.

Mr. Dowd increased his holdings from 491 shares to 2,007 shares;

Mr. Gillis increased his holdings from 8,731 shares to 13,406 shares;

Mr. Putzell increased his holdings from 470 shares to 3,563 shares; and

Mr. Lucas increased his holdings from 2,197 shares to 2,262 shares in December 1966. Thereafter, on December 30, 1966 and during the first eight months af 1967, when the prices were mostly in the 40's, Mr. Lucas sold the balance of his shares of Monsanto in view of the fact that he was leaving the company.

65. The two individual defendants who did not exercise any options during the years 1964–1966 were Edgar M. Queeny, deceased, and J. Russell Wilson:

(a) Mr. Queeny, the son of the founder of Monsanto, first joined Monsanto in 1919 and served as President from 1928 to 1943 and Chairman of the Board from 1943 to 1960, when he retired (but remained a Director). Mr. Queeny had disqualified himself from receiving any stock options by putting himself on the stock option committee when it was first formed. During the course of the ten-year period 1958–1968, Mr. Queeny made charitable gifts of approximately 109,000 shares of Monsanto stock. In September 1964, at a time when he personally owned some 189,556 shares of Monsanto, he sold 10,000 shares, to purchase tax-exempt municipal bonds, as he had been advised to do by Mr. James Fox, investment officer of the Mercantile Trust Company of St. Louis. About a year later, in August 1965, for diversification purposes, and in accordance with recommendations of Mr. Fox, he exchanged 5,000 shares of his then personal holdings of

some 181,606 shares of Monsanto stock for shares of an exchange fund. These were his only "sales" of Monsanto stock during the period September 1, 1964 through December 31, 1966, and at the end of 1966, after taking account of charitable gifts as well as stock dividends, Mr. Queeny's personal holdings of Monsanto stock were 181,702 shares.

(b) Defendant J. Russell Wilson, who was Director of Monsanto's Patent Department, sold 300 shares in September 1964 and 100 shares in April 1965 and purchased 100 shares of Monsanto stock, under the Employee Stock Plan, in August 1966. He held 2,039 shares of Monsanto on September 1, 1964 and on December 31, 1966, he held 1,804 shares. (Because of the intervening year-end two percent stock dividends, as well as reductions in holdings resulting from gifts of Monsanto stock, the holdings after transactions do not necessarily correspond to the arithmetic difference between the prior holdings and such transactions.)

66. Two methods were employed by the individual defendants to finance the exercise of stock options in connection with increasing their holdings of Monsanto stock. One method was that the optionee (a) at the time of the exercise of the option obtained a personal loan from a bank, (b) not less than six months thereafter, sold a sufficient number of his shares in order to repay the loan in whole or in part and, in some instances, also to provide for taxes, and (c) retained the rest of the shares. O'Neal, Sommer and Lucas used this program.

67. The other method of financing purchases of option stock was that the optionee (a) sold a number of shares of his Monsanto stock with the intention of using the proceeds to exercise his option for a larger number of shares, (b) invested the proceeds of the sale in short-term securities, and (c) about six months thereafter, exercised the option, paying for his purchase of the option stock with the proceeds of the sale of the short-term securities Bible, Bock and Rumer used this program.

68. The reason for exercising option rights in portions over the life of the option was testified to by Mr. O'Neal at the hearing:

"If you want my theory, I had an option for 12,000 shares of stock, to exercise over a period of ten years. In my personal judgment, I felt it was best for my family and myself and my future estate to exercise that option in reasonable blocks, not creating debt exposure beyond the limits of reason."

This testimony was accurate and honest.

69. In the opinion of Mr. Neidig, a recognized expert in securities, the procedure of obtaining a personal loan from a bank at the time of the exercise of an option and not less than six months thereafter selling a sufficient number of shares in order to repay the loan in whole or in part and in some instances also to provide for taxes, was not "the least bit unusual" among executives who did not have independent means of financing their transactions. These programs were sound and well within the discretion of reasonable businessmen following acceptable fiduciary practices.

70. The results of such a personal program of increasing holdings of Monsanto stock through the exercise of stock options are illustrated by the increases in the portfolios of Mr. Sommer and Mr. Gillis over the ten-year period 1958–1968:

(a) Mr. Sommer, who was Monsanto's President and chief executive officer for 1960–1968 and is now Chairman, owned about 19,000 more Monsanto shares in 1968 than in 1958 (increasing from 1,629 to 20,859), and about 4,000 more Monsanto shares at the end of 1966 than in 1964.

(b) Mr. Gillis, an officer and director, owned about 10,000 more shares of Monsanto in 1968 than in 1958 (increasing from 1,643 to 11,751 shares),

and about 5,000 more shares at the end of 1966, and about 3,000 more shares in 1968, than in 1964.

71. Other sales of Monsanto shares by certain of the individual defendants in the period September 1964 through February 1967 were made for miscellaneous proper personal purposes showing no pessimism about Monsanto's future; the timing of the sale was not based on private knowledge but was based on information available to the public.

72. The individual defendants held, in the aggregate, 277,497 shares of Monsanto stock on September 1, 1964, and 286,595 shares on February 28, 1967, an aggregate increase during this period of approximately 9,000 shares. There were no cash sales of Monsanto shares by any of the individual defendants during the period between September 23, 1965 and September 5, 1966, and no sales at all (including exchanges) between September 23, 1965 and March 28, 1966. (On March 29, 1966, defendant Eck exchanged 350 shares of Monsanto for shares of the Capital Exchange Fund. On April 7, 1966, a trust in which Mr. Queeny had certain limited interests exchanged 10,000 shares of Monsanto stock for shares of Second Presidential Exchange Fund, Inc.) During this period beginning in September 1965, the market price of Monsanto stock sold in the 80's and high 70's and continued in the 70's until mid-June 1966. Monsanto's stock price had gone from the high 70's to the 80's in September 1964, stayed in the 80's, with some rise into the 90's until November 1965, and was in the 80's and 70's until mid-June 1966. In September 1966, prices were in the 50's and 40's.

*The Reasonableness and Propriety of the Transactions*

73. The purchases and sales of Monsanto stock by the individual defendants were made in varying amounts and at different times over the period September 1, 1964 through December 31, 1966, pursuant to personal decisions about which no advice was sought from any of the other defendants or other officers or directors. The individual schedules for the period show that, in several instances, an individual defendant purchased Monsanto shares within a few days of the time that another individual defendant sold Monsanto shares.

74. The timing of the various transactions was not related to any period when there were available any adverse estimates or other information which would have been a reason for the sale at a particular time by an individual defendant.

75. At the time Edward A. O'Neal, then Monsanto's Chairman, sold shares in September 1964 and bought 4,000 shares, pursuant to option, in April 1965, he was "bullish" on the fiber business of Monsanto and expected continued growth, and had no reason to believe Monsanto's stock would go down. At the time of his sales in July 1964 and July-August 1965, Charles H. Sommer, then Monsanto's President, did not anticipate that the price of Monsanto would go down, nor did he have any "inside information" which would cause him to believe the affairs of Monsanto would deteriorate. Mr. Sommer thought the trend of Monsanto's operations would continue upward. On the occasions Arthur W. Lucas sold Monsanto stock over the period November 1964 through September 1966, he had no information which would lead him to believe that the stock price would go down, except about mid-September 1966. At that time it was generally known that the stock market, and also the price of Monsanto stock (then in the 50's), were both declining.

Tom K. Smith testified that on none of the dates of the sales by the individual defendants in September and December 1964, or throughout the period February-September 1965, or during March, April and September 1966 was there any adverse "inside information" available to the particular defendant which would have been a reason for the sale on such date by the defendant. There is no con-

tradictory evidence on this point; all the evidence is consistent with his testimony.

*Summary as to the Transactions of the Individual Defendants*

76. The sales of Monsanto shares by the individual defendants during the period from September 1, 1964 through the end of 1966 (and through the end of February 1967) were individual and unrelated, were made at varying times and prices, had none of the indicia of a distribution, were not unusual or suspicious, did not result in a dumping of the Monsanto stock owned by the individual defendants, and were not made in contemplation of a decline in the price of the stock based on inside information.

77. The sales of Monsanto shares by the individual defendants were made primarily in connection with individual programs for increasing holdings of Monsanto stock through the exercise of stock options, and also for other proper purposes in connection with individual needs.

78. The individual defendants did not trade on private knowledge or use any inside information in order to make personal profits in connection with any of their sales of Monsanto stock.

I. *The Reporting of Edgar M. Queeny's Exchange of 5,000 Shares of Monsanto Stock in 1965*

79. Edgar M. Queeny had approximately 60% to 65% of his total investments in Monsanto stock. At the suggestion of his securities adviser that he diversify his holdings, during April 1965 he had tendered 5,000 shares of Monsanto stock (of the 181,606 shares of Monsanto stock which he then owned) to an "exchange fund", i. e., a mutual fund to which an equity holder might tender shares in a particular company in exchange, on a tax-free basis, for shares of the mutual fund. Usually three to four months elapsed between the inception of such a transaction with an exchange fund and the actual consummation and the receipt of the fund's shares. In the transaction in question, the last date to withdraw the tendered shares by a depositing security holder was August 13, 1965. Subsequent to that date the fund issued its shares.

80. When Mrs. Abbie Wagner, Mr. Queeny's personal secretary, who since 1964 had regularly prepared and signed his name to any report to the SEC and to the New York Stock Exchange of change of ownership of securities, prepared and signed the report (SEC Form 4) for the period ending September 30, 1965, she did not report this transaction. In the middle of December she discovered the error and the day she learned of it she filed a corrected report with the Securities and Exchange Commission and the New York Stock Exchange.

81. Neither at the time of the report dated October 5, 1965 nor in December at the time of the correction did Mr. Queeny know that Mrs. Wagner had not reported the change of ownership in the 5,000 shares.

82. After disposing of the 5,000 shares of Monsanto stock, Mr. Queeny still owned 176,606 shares. Subsequent to the transaction which was the subject of the corrected report, Mr. Queeny never sold any other shares of Monsanto stock, and at the time of his death on July 7, 1968 his ownership of Monsanto shares had increased to 183,297 shares, more than the number of shares he held prior to the August-September 1965 transaction in the exchange fund.

83. There is no basis to question Mr. Queeny's good faith or Mrs. Wagner's good faith. The report to the Securities and Exchange Commission and the New York Stock Exchange Commission prepared on October 5, 1965 and reporting no change during the preceding month in the holdings of Monsanto stock by Mr. Queeny was mere clerical error.

J. *Monsanto's Purchases of Its Own Shares*

84. During the period from late 1964 through the end of 1966, Monsanto on oc-

casion purchased shares of its own stock on the New York Stock Exchange, in private purchases and in the "third market" for rounding out fractional shares purchased in connection with the year-end two percent stock dividends; for bonus purposes under its Bonus Plan; and to provide for possible future acquisition.

85. Monsanto has more than 30 million shares outstanding, and the trading volume in Monsanto shares on an annual basis during the period was some $2\frac{1}{2}$ to 3 million shares. All stock exchange purchases by Monsanto were small and the purchases by Monsanto of its own shares were for proper purposes and did not inflate the market price of Monsanto stock.

K. *General Conclusions*

86. Plaintiffs cannot show any substantial possibility that the statements complained of by plaintiffs concerning Monsanto's results, prospects, developments and problems contained any untrue statement of a material fact or omitted any material fact, or were misleading, deceptive, manipulative or in any way fraudulent.

87. Plaintiffs cannot show any substantial possibility that Monsanto's reporting and disclosure of the results of its operations did not meet the reporting and disclosure requirements of the Securities Act of 1933, the Securities Exchange Act of 1934, the regulations of the Securities and Exchange Commission, the rules of the New York Stock Exchange and all pertinent rules of common law.

88. Plaintiffs cannot show any substantial possibility that any of the statements by any defendant regarding Monsanto's sales, earnings, operations or prospects, or any other statements complained of by plaintiffs, violated any provisions of the Securities Act of 1933, the Securities Exchange Act of 1934, the regulations of the Securities and Exchange Commission or the rules of the New York Stock Exchange, or any principle of common law.

89. Plaintiffs cannot show any substantial possibility that any of the individual defendants engaged in a scheme, conspiracy or course of conduct to manipulate the price of Monsanto stock in order to make personal profits or for any other reason.

90. Plaintiffs cannot show any substantial possibility that any of the individual defendants traded in Monsanto stock while in possession of material undisclosed information, or otherwise utilized inside information for their personal gain.

91. Plaintiffs cannot show any substantial possibility that any of the sales of Monsanto stock made by the individual defendants violated any provisions of the Securities Act of 1933, the Securities Exchange Act of 1934, the regulations of the Securities and Exchange Commission or the rules of the New York Stock Exchange, or any principles of common law.

92. Plaintiffs cannot show any substantial possibility that the "Form 4" report prepared for Edgar M. Queeny in September 1965, was prepared and filed in bad faith and with any knowledge that it was false or misleading.

93. Plaintiffs cannot show any substantial possibility that Monsanto's purchases of its own shares were intended to manipulate, or were a manipulation of, the price of Monsanto stock.

94. Construing every scrap of evidence adduced or that might be adduced in a way most favorable to plaintiffs, there is no substantial possibility that plaintiffs will prevail on the merits.

95. Defendants demonstrated that there is no substantial possibility that a reasonable juror could find that they, or any of them, have committed the violation of the plaintiffs' rights alleged in the complaints as supplemented by the affidavits and further charges of plaintiffs' counsel.

96. The affidavits and further charges of plaintiffs' counsel were considered

as amending the complaints, and no further amendment of the complaints would change the conclusions set forth in these findings.

97. Plaintiffs cannot show any substantial possibility that there was a common plan, scheme, conspiracy, course of misconduct, fraud, or misconduct on the part of the defendants, or any of them.

98. Any apparent issues, including those referred to in the opinions of the Second Circuit dated September 2, 1970 and January 18, 1971, 438 F.2d 825, 833, regarding the extent of review of the raw data by others than the individual defendants and the revelation of start-up costs, investment tax credit and treatment of proceeds of sales of land are without merit and there is no substantial possibility that plaintiffs will be able to prevail on the merits with respect to these purported issues.

99. Maintenance of the action as a class action would subject defendants to an unwarranted and expensive litigation without any substantial possibility that the plaintiffs could prevail on the merits.

100. Defendants moved as soon as practicable after the commencement of the action for an order determining whether the action should be maintained as a class action and defendants' motion for such determination was not made prematurely.

101. There is no substantial possibility that the plaintiff will prevail on the merits with respect to the allegations of the amended complaint.

## VI.

■ As indicated by these findings and the evidence upon which they are based, the indisputable evidence demonstrates that defendants bought and sold stock of their company in good faith expectation of the company's success and based upon the same information available to outsiders. The information they released was accurate and comprehensive and defendants believed in its truth. They took no advantage of insider knowledge, did not use their corporate position to manipulate the market and made their decisions as honest businessmen for the benefit of their corporation.

Were suits in the posture of this one allowed to continue as class actions, many managers of large enterprises would be placed in an intolerable position. As revealed by the record of this case, some of them are men of relatively limited financial resources who have risen quickly and recently through the technical ranks because of their skill and optimism.

■■ A rule of law too restrictive and inflexible may overinhibit and dampen their drive without providing gain to the investor in the form of more reliable predictions. Some judgment and understanding of executive psychology is to be expected of the investor who has all the data required by the Securities and Exchange Commission, the stock exchanges, stock analysts and standard accounting practice.

The successful executive is likely to possess a "sure conviction" that his business's problems can be solved; he brings to them "a bursting enthusiasm that is not found in the average man." O. Elliott, Men at the Top, 224 (1959). See also, e. g., R. Kahn, D. M. Wolfe, R. P. Quinn, J. D. Snoek, R. A. Rosenthal, Organizational Stress: Studies in Role Conflict and Ambiguity, 321 (1964); R. Kappel, Vitality in a Business Enterprise (1960) reprinted in Harriss, Selected Readings in Economics (2d ed. 1963), 37, 38. An "ability to generate confidence" and to convince subordinates that the company is "going toward a goal which all would like to achieve" is seen as one of the chief assets of a successful executive. V. Packard, The Pyramid Climbers, 170–71 (1962). The successful young executive is "aggressive in his views toward competitors . . .; confident in his ability . . . to win." W. Guzzardi, Jr., The Young Executives, 6 (1965). "He is accustomed to winning

—largely because he competes so fiercely to win." *Id.* at 24–25. A sense of optimism and success may be important to the "spirit of an organization and its power of accomplishment." H. W. Steinkraus, Chapter of Motivating, in H. B. Maynard, Top Management Handbook, 351, 352 (1960). By acceptable standards, the individual defendants in this case were conservative in their expectations and predictions.

■ To encourage such men, they are often granted stock options with the consent of the shareholders. While stock options now have a large attraction for their tax avoidance advantages (M. W. McCarthy, Chapter on Top Management's Stake in the Securities Market, in H. B. Maynard, Top Management Handbook, 1040, 1048 (1960)), they still are granted on the assumption that the executives will retain and "increase their ownership interest" and that this will help motivate them to improve the company. A. P. Sloan, Jr., My Years With General Motors, 415 (1964). "Many stockholders feel that directors and officers should have a meaningful investment in the companies they manage. . . . The Exchange has encouraged the broadening of share-ownership through stock option . . . plans." New York Stock Exchange, The Corporate Director and the Investing Public, 11 (1965). It is significant that the defendants in the case at bar, as a group, and particularly those actually running the corporation, substantially increased their holdings during the period about which plaintiffs complained.

■ To take advantage of these options many managers must borrow. Some —as in the instant case—engage in a conservative plan of selling part of their stock after they have held their shares for six months to take advantage of tax benefits and to avoid liability under section 16(b) of the Securities Exchange Act, paying off their loans and exercising new options so that they gradually build up their holdings without assuming huge

debts. *Id.* at 12. *Cf.*, Abrams v. Occidental Petroleum Corp., 450 F.2d 157 (2d Cir. 1971).

■ These insiders are also encouraged to issue information and to open their doors to analysts so that relations with money markets will remain good and so that money for plant expansion—amounting to yearly expenditures of hundreds of millions of dollars for some companies —will be available when needed. New York Stock Exchange, The Corporate Director and The Investing Public, 4–5 (1965); Report of the Special Study of the Securities Markets and Exchange Commission, H.R.Doc.No.95, 88th Cong., 1st Sess.; pt. 3, 65 ff. As one commentator noted:

> "The importance of maintaining personal contact with the financial community cannot be overemphasized. Contrary to its reputedly exclusive concern with the purely dollars-and-cents aspects of business, Wall Street places an especially high value on the human element, for it knows how largely the accomplishments of a corporation are the reflections of the personalities and abilities of its top management. Therefore analysts appreciate meeting with corporate executives.
>
> . . .
>
> Meeting these desires on the part of the analyst group is clearly to the advantage of any company, including the very largest."

H. Hettinger, Financial Public Relations, 150 (1954).

It is not unusual to delegate a large part of this role to "the office of vice president in charge of finance." O. R. Cheatham, Chapter on Top Management's Responsibility for Finance and Control, in H. B. Maynard, Top Management Handbook, 633, 642 (1960). *See,* also, M. W. McCarthy, Chapter on Top Management's Stake in the Securities Markets in *Id.* at 1040. It is not a suspicious circumstance that defendants assigned Mr. Lucas, a vice-president, to meet with representatives of the finan-

cial community. His statements to them were based upon his and management's best estimates, honestly and efficiently arrived at, and these estimates were quickly disseminated to the market at large through the press.

█ Some business judgment must be exercised with respect to the release of details. *See, e. g.*, Cohen, Disclosure, The S.E.C. and the Press, 159, N.Y.L.J., May 23, 1968, at 1. In a highly competitive industry detailed knowledge of a competitor's problems may be used by other producers to lure away key personnel or customers, to expand in areas where weakness is shown, or to take other aggressive action. It sufficed, therefore, for defendants to do what they did in indicating generally that they had plant start-up problems and to reveal the implications of this fact on possible profits. Details as to plants and products were properly withheld as a matter of sound business judgment.

█ Reliance on recognized accounting practice is acceptable in deciding upon the form in which fiscal data is released, at least until the S.E.C. rules to the contrary. *Cf.* Cohen, Corporate Disclosure: Reporting for Diversified Companies, 160, N.Y.L.J., Oct. 30, 1968, at 1; S.E.C. Publishes Disclosure Rules on Conglomerates, N. Y. Times, February 19, 1969, at 61, col. 2. Defendants' treatment in their reports of various non-recurring gains constituted an acceptable business judgment so far as investors were concerned. *Cf.* H. W. Bevis, Corporate Financial Reporting in a Competitive Economy, 162–64 (1965).

Particularly where the law is changing, retroactive application by courts of unreasonably strict standards of disclosure can be quite unfair to those who acted in good faith and without violating any reasonable fiduciary standards. *See, e. g.*, as to contemporary confusion on the issue, Metz, Disclosure Rule Has Side Effect, N. Y. Times, Dec. 10, 1968, at 66, col. 7; Vartan, Wall Street Asks Who Can Tell What to Whom and When,

Legally, N. Y. Times, Dec. 1, 1968, § 3, at 1, col. 1; Robards, Disclosure Rule Kept by Telling All—or Nothing, N. Y. Times, Nov. 10, 1968, § 3 at 5, col. 1; Haack, Corporate Disclosure: When in Doubt, Disclose, 160 N.Y.L.J., Oct. 31, 1968, at 1; Analysts Assail Data Tightening, N. Y. Times, Oct. 9, 1968, p. 61, col. 5; Robards, To Disclose or Not: The Law Seeks Answer, N. Y. Times, Oct. 13, 1968, § 3, at 1, col. 1; Robards, Analysts Ask "Open-Door" Disclosure Policy, N. Y. Times, Sept. 20, 1968, at 67, col. 2; Vartan, Basking Stock Analysts Catch a Chill, N. Y. Times, Sept. 15, 1968, § 3, at 1, col. 1; Robards, Disclosure: What Next?, N. Y. Times, Sept. 15, 1968, § 3, at 1, col. 2; Robards, S.E.C. Calls "Insider" Cases Beneficial, N. Y. Times, Sept. 12, 1968, at 71, col. 8; Sommer, Jr., Conglomerate Financial Reporting, 23, Bus.Law. 521 (1968); Schwartz, Legal Implications of Product Line Reporting, 23 Bus.Law. 527 (1968).

█ Except in cases of breach of known fiduciary obligations, prospective rules by the Securities and Exchange Commission, stock exchanges, legislation, or by adoption of new accounting standards are a more reasonable method of obtaining guidance than through massive class actions of the kind before us. *See, e. g.*, Report of the Special Study of the Securities Markets of the Securities and Exchange Commission, H.R. Doc. No. 95, 88th Cong., 1st Sess., pt. 3, 102 (1963); Schulman, Book Review, 15 Wayne L.Rev. 1374, 1387 (1969). Compare the entirely different cases of deliberate reaching out for profit based on insider knowledge or control in Rosenfeld v. Black, 445 F.2d 1337 (2d Cir. 1971) or S. E. C. v. Texas Gulf Surphur Co., 401 F.2d 833 (2d Cir. 1968), cert. denied sub nom. Kline v. S. E. C., 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969). *Cf.* Cary, Corporate Standards and Legal Rules, 50 Calif.L.Rev. 408, 419–20 (1962); Pointer, Inside Information: Growing Pains For the Development of Federal Corporation Law Un-

der Rule 10b–5, 65 Colum.L.Rev. 1361, 1384 (1965). There can be no liability if, as here, "the information published was the whole truth and \* \* \* such diligently obtained information was published in good faith." Securities & Exch. Comm. v. North American R. & D. Corp., 424 F.2d 63, 79 (2d Cir. 1970).

While perhaps overstated for emphasis, Professor Berle reflected the essence of the principle of freedom from unnecessarily detailed legal control over unregulated business decisions when he wrote:

"The standard of decision-taking has to be in the light of a situation as it stands when the course is charted and the die cast. Within a wide range, management power is absolute.

It could hardly be otherwise. If every decision by management were reviewable on all of its merits, the reviewing authority—court, investigating commission, regulatory authority, or whatnot—would be, in the old phrase 'substituting its business judgment for the business judgment of management.' In effect it would be running the business. If anything is settled it is that the exercise of power within the range of its permissible use is lonely business. Within that range the true judge is the conscience of the man or men who act." A. A. Berle, Jr., The 20th Century Capitalist Revolution, 63–64 (1954).

A rule of law which threatens to seriously control management in its vital production and distribution tasks needs more persuasive support than has been supplied in this case.

▮▮▮ This freedom, must, we recognize, be subject to the rigorously enforced rule that membership on the board of directors may not be used to obtain private benefit. Managers may no longer use insider knowledge of the corporation's activities for their own profit. See, e. g., S. E. C. v. Texas Gulf Sulphur, 401 F.2d 833 (2d Cir. 1968), cert. denied

sub nom. Kline v. S. E. C., 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969).

A distinction should be drawn between information about internal corporate affairs and general information about current affairs in the world at large. As Berle and Means described the matter:

"[T]he rules must be limited to facts peculiar to the corporation. Declaration of war in Europe, for example, might at once change the picture with regard to an American steel company; and the company might have advance knowledge of the fact; but a European war is not the affair of the steel company; and it is not at present considered either ethical or desirable to require the management to make such a disclosure. On the other hand, a tremendous order making large profits certain for the coming year would be a fact peculiarly within the knowledge of the company." A. A. Berle, Jr. and G. C. Means, The Modern Corporation and Private Property, 323–24 (1933).

In the instant case the failure of Monsanto to meet the expectations of its management was due almost entirely to unforeseeable major adverse changes in the economy both here and abroad. The problem was not one of withholding news of internal developments from the public.

▮▮▮ When an insider profits by stock market transactions while general shareholders are losing, the shareholders have reason for suspicion and should be permitted to investigate thoroughly. If, for the sake of the corporation, bad or good news is withheld, then an insider may not act on it. Any question must be resolved by the insider against his individual gain. Hindsight has some evidentiary value because of the difficulty of an outsider-shareholder determining what special insights and information were available to individuals within the corporation. But the evidence in the case at bar demonstrates as clearly as it is ever possible to that the trading of

management was innocent and in connection with private programs of investment having nothing to do with corporate prospects. Practically all the sales pointed to were made long before the stock market price of Monsanto dropped sharply. And most of them were made considerably below the top of the market. Moreover, the allegedly overoptimistic statements were made at times bearing no relationship to the sales.

For plaintiffs to succeed in a case such as this in effect requires adoption of a rule that sales by insiders when they are issuing favorable reports—no matter how justified when made—constitute a *per se* violation of the securities laws making them liable to anyone who buys during this period and then suffers a loss in a downward turning market. We do not think the law is so draconian.

## VII.

■ Since the dismissal of the class action aspect of the case is on the merits, no notice to prospective members of the class is required. Subdivision (e) of Rule 23 does provide that notice must be given of a "proposed dismissal or compromise." This requirement does not apply to noncollusive involuntary dismissals.

> "It is intended to prevent a conclusive dismissal by plaintiff of an action in which others may be legitimately interested. It does not apply to an order of dismissal of the court upon the merits." Pelelas v. Caterpillar Tractor Co., 113 F.2d 629, 633 (7th Cir.), cert. den., 311 U.S. 700, 61 S.Ct. 138, 85 L.Ed. 454 (1940).

*See,* also, Laurenzano v. Texaco, Inc., CCH Fed.Sec.L.Rep. ¶ 92,950 (S.D.N.Y. 1971); 3B Moore's Federal Practice ¶ 23.80 [3] (1969).

Members of a class of potential plaintiffs are free—subject to the possible defense of laches or the running of the statute of limitations—to bring independent actions. In any event, an action

without potential merit does not constitute a significant interest of absentees. *See* Dole, Jr., The Settlement of Class Actions for Damages, 71 Colum.L.Rev. 971, 986 (1971).

One reason for denying leave to continue as a class action is to avoid the need for notice. Were notice required before a dismissal of representative aspects of the litigation, there would be no way of avoiding saddling defendants with large burdens no matter how meritless the claim against them. Requiring notice in all cases would nullify the benefits to be expected from a merits hearing.

A discretionary power of the trial court to decide without notice was suggested by the draftsmen of Rule 23 who wrote:

> "Whether the court should require notice to be given to members of the class of its intention to make a determination [as to whether the suit should proceed as a class action], or of the order embodying it, is left to the court's discretion under subdivision (d) (2)." Note to Rule 23 of the Advisory Committee on Rules.

The instant case presents no justification for the exercise of discretion to require notice. The class of potential plaintiffs will not be prejudiced by any determination this court may make on the merits. Should the individually named plaintiffs ultimately prevail—and there has been no showing that this is a realistic possibility—the court could then consider re-instatement of the class action. *See* Rule 23(c) (1) ("order * * * may be altered or amended before the decision on the merits").

The matter has been so strenuously and effectively tried by counsel for plaintiffs that we take this action denying permission to proceed under Rule 23 secure in the belief that no other representative of the purported class would have affected the decision.

## VIII.

This action shall not be maintained as a class action. This decision is made without respect to whether summary judgment is granted.

So ordered.

[On November 5, 1971 defendants' motion for summary judgment was granted and the action was dismissed by the trial court.]